921 A.2d 837

The JOHNS HOPKINS HOSPITAL, et al.

v.

Jane E.S. CORREIA, et ux.

No. 2453, Sept. Term, 2005.

Court of Special Appeals of Maryland.

April 30, 2007.

Ronald W. Shaw (Amanda P. Just, on brief), Towson, for appellant.

Paul D. Bekman, Emily C. Malarkey (Gregory G. Hopper, on brief), Baltimore, for appellee.

Panel SALMON, SHARER, MEREDITH, JJ.

SALMON, J.

About one hundred years ago, the Maryland Court of Appeals held that one who "is engaged in the undertaking of running an elevator as a means of personal transportation" is required to use the "highest degree of care and diligence practicable under the circumstances," which is the same standard that common carriers are required to meet. *See Belvi-*

*dere Bldg. Co. v. Bryan,* 103 Md. 514, 539–40, 525, 64 A. 44
(1906). The rule in *Belvidere* was reaffirmed in 1930 and
again in 1937. *See Owners' Realty Co. of Baltimore City v.
Richardson,* 158 Md. 367, 371, 148 A. 543 (1930); *O'Neill &
Co. v. Crummitt,* 172 Md. 53, 60–61, 190 A. 763 (1937). Since
1937, no Maryland appellate decision has been called upon to
decide whether the rule first enunciated in *Belvidere* is still
binding precedent.[1]

---

1. In *Otis Elevator Co. v. Embert,* 198 Md. 585, 84 A.2d 876 (1951), the
Court hinted, but did not decide, that an elevator owner/operator owed
a higher degree of care to its passengers than to an ordinary invitee.
The *Embert* case involved a claim by a passenger in a self-operated
elevator who sustained injuries when she opened the doors and stepped
into an elevator, which had been stopped by another passenger about
twelve-and-one-half inches below floor level. *Id.* at 592–93, 84 A.2d 876.
The plaintiff, Embert, sued the owner of the elevator and Otis Elevator
Company ("Otis"), which had a contract to maintain the device. *Id.* at
589–90, 84 A.2d 876. The elevator had been installed in 1930 and had
no self-leveling mechanism, *id.* at 589, 84 A.2d 876, but at the time of
the accident (1949) self-leveling devices were "very expensive" and not
in general use in this country. *Id.* at 591–92, 84 A.2d 876.

Embert failed to show that the elevator was defective, nor did she
introduce any evidence showing that Otis had failed to keep the elevator
in good repair. *Id.* at 595, 84 A.2d 876. At trial, the theory of
negligence against the owner of the elevator was, apparently, that the
owner was negligent in failing to warn passengers to "watch their step"
and to refrain from stopping the elevator car by opening the inner door
before the elevator was level with the landing. *Id.* at 600, 84 A.2d 876.

The jury in *Embert* returned a verdict against both the elevator owner
and Otis in regard to plaintiff's claim in chief but found in favor of Otis
on the owner's third-party claim for indemnity. *Id.* at 587, 84 A.2d
876.

On appeal, Otis challenged the plaintiff's verdict against it, but the
owner did not. *Id.* The question decided in *Embert* concerned "the
scope of Otis's undertaking when it signed the maintenance contract"
with the owner. *Id.* at 600, 84 A.2d 876. In answering that question,
the Court assumed, but did not decide, that within the scope of Otis'
undertaking to maintain the elevators, it owed plaintiff the same degree
of care that the elevator owner owed her. *Id.* The Court, however, did
not say what that duty was. The Court did say, however:

> In discussing the degree of care required of those who transport
> passengers in elevators this court has recognized that an elevator,
> especially if not maintained and operated with great care, "is in many
> respects a dangerous machine." *Belvidere Building Co. v. Bryan,* 103
> Md. 514, 534–538, 64 A. 44 [(1906)]; *Wise v. Ackerman,* 76 Md. 375,
> 389, 25 A. 424 [(1892)]; *Owners' Realty Co. v. Richardson,* 158 Md.
> 367, 148 A. 543 [(1930)].

On August 30, 2000, Jane Correia was a passenger in an elevator owned and operated by Johns Hopkins Health Services Company and Johns Hopkins Hospital (hereinafter collectively "Johns Hopkins" or "appellant"). The elevator came to a sudden stop because of a mechanical defect. Due to injuries allegedly caused by this malfunction, Mrs. Correia and her husband sued Johns Hopkins, and others, in the Circuit Court for Baltimore City for negligence. The matter was considered by a jury in October 2005.

The Correias introduced evidence that showed that, in the six months prior to the accident, Johns Hopkins had received thirty-two complaints about the elevator Mrs. Correia was in when the accident occurred. The thirty-two complaints, if accurate, indicated that at various times prior to the accident the elevator was dropping, jumping, jerking, skipping, and sometimes trapping passengers.

At the end of a nine-day trial, the court gave the jury the following instruction:

> The owner of a passenger elevator, in this case . . . Johns
> Hopkins is the owner of the passenger elevator[,] is bound

*Id.* at 599, 84 A.2d 876.

The rule first enunciated in *Belvidere* was again mentioned, in dicta, in *Flowers v. Rock Creek Terrace Ltd. P'ship*, 308 Md. 432, 520 A.2d 361 (1987). In that case, the plaintiff was a firefighter who, due to "heavy smoke," accidentally stepped into an open elevator shaft and was injured. *Id.* at 436–37, 520 A.2d 361. The plaintiff claimed, *inter alia*, that the property owner owed him a duty of care similar to that owed by a common carrier. The Court of Appeals rejected that argument when it said:

> "[T]he higher duty a common carrier owes extends only to its passengers." *Sheridan v. Balto. & Ohio R. Co.*, 101 Md. 50, 57, 60 A. 280 (1905). *See Jackson v. Hines*, 137 Md. 621, 626, 113 A. 129 (1921). The analogous higher duty owed by an elevator operator is to its passengers. *O'Neill & Company v. Crummitt*, 172 Md. 53, 60, 190 A. 763 (1937) ("the degree of care due by the owner of a passenger elevator to those who are expressly or impliedly invited to ride therein is similar to that which a common carrier owes its passengers"). Flowers was not a passenger in the elevator. Moreover, the higher duty owed to an elevator's passengers has no relationship to the anticipated risks which are inherent in the fireman's occupation.

*Id.* at 452, 520 A.2d 361 (footnoted omitted).

to exercise to the highest degree of care and skill and diligence ... practicable under the circumstances to guard against injury to individuals riding on those elevators. This rule of law applies to the owner of the elevator only. It does not apply to the service company [co-defendant] Schindler [Elevator Company].

The jury returned a verdict in favor of Mrs. Correia in the amount of $264,500 and separate $35,500 verdict in favor of Mr. and Mrs. Correia, jointly, for loss of consortium. Both verdicts were against Johns Hopkins; the jury found that co-defendant Schindler Elevator Company was not negligent.

In this appeal, Johns Hopkins contends, among other things, that the trial judge committed reversible error in giving the instruction quoted above. According to appellant, the owner of a self-operating elevator owes a passenger the same duty that any other property owner owes its invitee, i.e., the duty to use reasonable care to see that the portion of the property that the invitee is expected to use is safe. In support of its position, Johns Hopkins advances four major arguments.

First, according to Johns Hopkins, "the application of a common carrier theory of liability to modern building owners is no longer appropriate," although such a heightened standard of care "may have been appropriate one hundred years ago when *Belvidere* decided the question as a matter of first impression." Second, "the cases upon which the trial court" relied in giving the instruction at issue are factually distinguishable from this case. Third, the instruction should not have been given because elevator owners are not common carriers under Maryland law. Fourth, since *Belvidere* was decided, the Maryland Court of Special Appeals has decided a case that suggests that "the proper standard of care for an elevator owner is that of reasonable care."

## I.

The common law rule in the District of Columbia and fourteen of our sister states is in accord with Johns Hopkins'

position that the duty of an owner or operator of an elevator to its passengers is to use ordinary or reasonable care and not the highest degree of care. *See Lowrey v. Montgomery Kone, Inc.*, 202 Ariz. 190, 42 P.3d 621, 627 (2002) (the owner/operator of a passenger elevator does not owe "a higher duty toward its passengers than that of reasonable care under all of the circumstances"); *Hafferman v. Westinghouse Elec. Corp.*, 653 F.Supp. 423, 430 (D.D.C.1986) (the hotel "owed a duty of reasonable care . . .; a duty that included the need to properly inspect and repair the elevator"); *McKenna v. Grunbaum*, 33 Idaho 46, 190 P. 919, 921 (1920) (it is the duty of the landlord to use reasonable care to keep and operate its elevator); *Summers v. Montgomery Elevator Co.*, 243 Kan. 393, 757 P.2d 1255, 1261–62 (1988) ("[T]he elevator . . . is not a common carrier and . . . the duty to the public with regard to it is that of ordinary care."); *Smith v. Otis Elevator Co.*, 217 F.Supp.2d 105, 108 (D.Me.2002) ("the owner or operator of an elevator in a lodging establishment" does not have the duty of common carriers to use the highest degree of care); *Clarke v. Ames*, 267 Mass. 44, 165 N.E. 696, 697 (1929) (office building owners "in operating an elevator were not common carriers" and thus owed only a duty to use reasonable care); *Burgess v. Stowe*, 134 Mich. 204, 96 N.W. 29, 31 (1903) (owner of store with an elevator "was bound to use the care required of an ordinarily prudent person under the circumstances"); *General Tire & Rubber Co. v. Darnell*, 221 So.2d 104, 107 (Miss.1969) ("The owner or occupier of business premises [where plaintiff was injured by elevator doors] owes business invitees the duty to exercise reasonable or ordinary care to keep the premises in a reasonably safe condition."); *Stone v. Boscawen Mills*, 71 N.H. 288, 52 A. 119, 121 (N.H.1902) (building owner should "exercise . . . ordinary care" with regard to the maintenance of elevators); *Rosenberg v. Otis Elevator Co.*, 366 N.J.Super. 292, 841 A.2d 99, 105 (2004) ("An owner of a building has a non-delegable duty to exercise reasonable care for the safety of tenants and persons contracts for maintenance of an elevator does not relieve it of that duty. . . ."); *Griffen v. Manice*, 166 N.Y. 188, 59 N.E. 925, 928–29 (1901) (in a case involving a

decedent who was struck by an elevator part, the court said that "sufficient security is afforded the public when owners or occupants of a building are required to use reasonable care in the character of the appliance they provide, and in its maintenance and operation"); *Bethel v. New York City Transit Auth.*, 92 N.Y.2d 348, 681 N.Y.S.2d 201, 703 N.E.2d 1214, 1215 (1998) (common carrier's duty in New York is to use "reasonable care under the circumstances"); *Williams v. 100 Block Associates, Ltd.*, 132 N.C.App. 655, 513 S.E.2d 582, 584 (1999) (no matter the status of the plaintiff or the presence of elevators, all landowners have "only the duty to exercise reasonable care in the maintenance of their premises for the protection of lawful visitors"); *White v. Milner Hotels, Inc.*, 267 Or. 628, 518 P.2d 631, 633, 635 (1974) (instructing the jury that an elevator operator owes the duty of using the highest degree of care is improper; the applicable duty is to use reasonable care); *King v. J.C. Penney Co.*, 238 S.C. 336, 120 S.E.2d 229, 230–31 (1961) (the owner of an elevator has the duty to exercise "ordinary and reasonable care as to its operation rather than the high degree of care similar to that imposed upon common carriers"); *Dallas Market Ctr. Dev. Co. v. Liedeker*, 958 S.W.2d 382, 384 (Tex.1997) (owner/ operator of elevators owes passenger a duty to exercise ordinary care).

The common law in twenty-one of our sister states is in accord with the rule set forth in *Belvidere*. *See Container Corp. of America v. Crosby*, 535 So.2d 154, 156 (Ala.1988) ("[A] n elevator, whether passenger or freight, is a common carrier and, as such, is to be operated and maintained with the highest degree of care."); *Little Rock Land Co. v. Raper*, 245 Ark. 641, 433 S.W.2d 836, 841 (1968) (owner of elevator "has the same duty to protect passengers using his elevators from injury as do common carriers of passengers, i.e., to exercise the highest degree of skill"); *Lane v. Montgomery Elevator Co.*, 225 Ga.App. 523, 484 S.E.2d 249, 251 (1997) ("A building owner ... 'owes a duty of extraordinary diligence to elevator passengers....' "); *Jardine v. Rubloff*, 73 Ill.2d 31, 21 Ill.Dec. 868, 382 N.E.2d 232, 236 (1978) ("[O]wners of buildings with

elevators are viewed as common carriers who owe their passengers the highest degree of care...."); *Tippecanoe Loan & Trust Co. v. Jester*, 180 Ind. 357, 101 N.E. 915, 918 (1913) (as to elevator passengers, landlords must "exercise the highest care, as a duty owing by law, to third persons who have a right to their use, or for whom they are provided"); *Monaghan v. Equitable Life Ins. Co. of Iowa*, 184 Iowa 352, 168 N.W. 892, 892 (Iowa 1918) ("[O]ne who operates a passenger elevator ... is held to the same measure of care that is required of a public carrier of passengers; that is, the highest degree of skill and foresight consistent with the efficient use and operation of the means of conveyance."); *Kentucky Home Mut. Life Ins. Co. v. Wise*, 364 S.W.2d 338, 341 (Ky.1961) ("[H]igh degree of care [is] required of the operator of elevators as in the case of other common carriers of passengers...."); *Otis Elevator Co. v. Seale*, 334 F.2d 928, 929 (5th Cir.1964) (applying Louisiana law) (the duty of an owner of a passenger elevator "as to protecting the passengers in his elevator from danger is the same as that applicable for" common carriers); *Goodsell v. Taylor*, 41 Minn. 207, 42 N.W. 873, 873 (1889) (the owner and manager of a passenger elevator is required to use "the utmost human care and foresight"); *Davidson v. Otis Elevator Co.*, 811 S.W.2d 802, 804–05 (Mo.App.1991) (owners of elevators "owe passengers the highest degree of care"); *Cash v. Otis Elevator Co.*, 210 Mont. 319, 684 P.2d 1041, 1043 (1984) ("[I]n the operation of an elevator, we feel the owner owes a higher degree of care. The elevator performs the function of a common carrier in transporting people from one floor to another."); *Dailey v. Sovereign Camp*, 106 Neb. 767, 184 N.W. 920, 924 (1921) ("[T]he owner of a passenger elevator ... is subject to the same degree of care with respect to those using the elevator that is imposed upon common carriers. ... [which is] 'the utmost diligence and care of very cautious persons, and responsib[ility] for the slightest neglect.' "); *M & R Inv. Co. v. Anzalotti*, 105 Nev. 224, 773 P.2d 729, 730 (1989) ("[A]n elevator owner 'owes a higher degree of care in performing the function of transporting people from one floor to anoth-

er.' "); *Norman v. Thomas Emery's Sons, Inc.*, 7 Ohio App.2d 41, 218 N.E.2d 480, 482 (1966) ("[A] passenger elevator is classified as a common carrier so that the duty owed to the passengers [on an automatic elevator] is to exercise the highest degree of care...."), *rev'd on other grounds; Smith v. Munger*, 532 P.2d 1202, 1205 (Okla.App.1975) (" 'The owner of passenger elevators owes to the passengers using the same the highest degree of care, vigilance, and precaution.' "); *Dallas v. F.M. Oxford, Inc.*, 381 Pa.Super. 89, 552 A.2d 1109, 1113 n. 4 (1989) (the owner/operator of the elevator owes a duty of "the highest degree of care to passengers"); *Willoughby v. Montgomery Elevator Co.*, 87 S.W.3d 509, 512 (Tenn.Ct. App.2002) ("[T]he owners and operators of elevators have an 'obligation to passengers on elevators ... [that] is the same as that of common carriers to passengers, and ... they must use and exercise the highest degree of care and precaution.' "); *Kleinert v. Kimball Elevator Co.*, 905 P.2d 297, 301 (Utah Ct.App.1995) ("[E]levator owners should be held to the common-carrier standard of care. The elevator performs the function of a common carrier by transporting people from one floor to another."); *Murphy's Hotel v. Cuddy's Adm'r*, 124 Va. 207, 97 S.E. 794, 797 (1919) ("[O]ne maintaining a passenger elevator in a hotel or other public building is ... a common carrier and ... 'he is required to exercise the highest degree of care....' "); *White v. Sears, Roebuck and Co.*, 242 F.2d 821, 823 (4th Cir.1957) (applying Virginia law) ("[I]n Virginia owners of elevators are common carriers and held to the highest degree of care known to human prudence."); *Pruneda v. Otis Elevator Co.*, 65 Wash.App. 481, 828 P.2d 642, 647 (1992) (owner of elevator is a common carrier who has the duty to exercise the highest degree of care); *Dehmel v. Smith*, 200 Wis. 292, 227 N.W. 274, 275 (1929) ("The elevator is a common carrier of passengers, and the degree of care ... [is] the highest....").

In addition, California has enacted a statute that provides that one controlling or running an elevator owes a passenger the duty to use the highest standard of care. *Gomez v. Superior Court*, 35 Cal.4th 1125, 29 Cal.Rptr.3d 352, 113 P.3d

41, 44–45 (2005) (stating that California Civil Code section 2100, which requires "[a] carrier of persons for reward" to use "the utmost care and diligence for their safe carriage," applies to elevators).

Although no Maryland appellate court has yet decided the issue, most (but not all) courts in this country impose the same duty upon the owners/operators of escalators as that imposed upon those who own or operate elevators. Nine states hold that the duty owed by an operator or owner of an escalator is merely to exercise ordinary care.[2] Five states, however, hold that under the common law the owner/operator of an escalator owes the passenger the highest degree of care.[3] Two states,

---

**2.** *See Estabrook v. J.C. Penney Co.,* 105 Ariz. 302, 464 P.2d 325, 328 (1970) (the question to be answered in an escalator-injury case was whether the defendant "exercised ordinary care in the operation and maintenance of the particular escalator"); *Stratton v. J.J. Newberry Co.,* 117 Conn. 522, 169 A. 56, 57 (1933) ("In operating its escalator for the convenience of its customers, the defendant was not a common carrier of passengers...."); *Burdine's, Inc. v. McConnell,* 146 Fla. 512, 1 So.2d 462, 463 (1941) (a department store with an escalator "owed a duty to exercise a reasonable degree of care not to injure [plaintiff, an invitee]"); *Tolman v. Wieboldt Stores, Inc.,* 38 Ill.2d 519, 233 N.E.2d 33, 36 (1967) ("We cannot agree that a rule applying to elevators must necessarily apply to escalators.... It is our view that defendant owed plaintiff the same duty owed any other business invitee upon its premises [i.e., duty to use reasonable care]."); *Winfrey v. S.S. Kresge Co.,* 6 Mich.App. 504, 149 N.W.2d 470, 471 (1967) (an owner of a store with an escalator "is under a duty to use reasonable care to provide reasonably safe premises for [its] customers"); *Richter v. Bamberger & Co.,* 11 N.J. Misc. 229, 165 A. 289, 290 (1933) (owner of store with escalators has the duty to "exercise reasonable care to keep the floor and such other parts of its store ... in such condition of repair that it would be reasonably safe for [an invitee] ... to be upon and about such premises"); *Aquilino v. R.H. Macy & Co.,* 12 A.D.2d 765, 209 N.Y.S.2d 336, 337 (N.Y.App.Div.1961) (court upheld trial court's judgment on the ground that plaintiff offered no proof that "defendant failed to use reasonable care in [the escalator's] inspection and maintenance"); *Young v. Anchor Co.,* 239 N.C. 288, 79 S.E.2d 785, 789 (1954) (department store owner must "exercise due care in the performance of its duty in the maintenance, inspection and operation of the escalator"); *King v. J.C. Penney Co.,* 238 S.C. 336, 120 S.E.2d 229, 230–31 (1961) ("[T]he owner [of an elevator] was charged with the exercise of ordinary and reasonable care as to its operation ...; and the same law is generally applied to owners of escalators as is applied to owners of elevators.").

**3.** *See Vallette v. Maison Blanche Co.,* 29 So.2d 528, 531 (La.Ct.App. 1947) ("[A]n escalator is to be likened to an elevator and ... the

California and Georgia, have enacted statutes imposing upon the owner/operator of an escalator the duty to use the highest degree of care.[4]

In *Gomez*, the California Supreme Court gave a history of the genesis of the legal principle—now almost universally recognized in the United States—that common carriers owe their passengers the highest degree of care:

[The] heightened duty imposed upon carriers of persons for reward stems from the English common law rule that common carriers of goods were absolutely responsible for the loss of, or damage to, such goods. (Beale, *The History of the Carrier's Liability* in Selected Essays in Anglo–American Legal History (Assn. of Am. Law Schools, edit.,

operator of an elevator is under obligations similar to those imposed by law upon common carriers...."); *S.S. Kresge Co. v. McCallion*, 58 F.2d 931, 932–33 (8th Cir.1932) (applying Missouri law) ("[A] carrier owes a 'high degree' of care to its passengers.... [The escalator] can well be regarded as a 'carrier' within the meaning of this rule as to negligence and care. Whether the escalator is technically a 'carrier' or not is really not vital, since the nature of this form of transportation is such that the same degree of care should, at least by analogy, be required.") (citation omitted); *McVey v. City of Cincinnati*, 109 Ohio App.3d 159, 671 N.E.2d 1288, 1290 (1995) ("By installing escalators[,] the city became a common carrier of persons and owed the highest degree of care to those individuals utilizing one of its escalators."); *Gilbert v. Korvette's, Inc.*, 223 Pa.Super. 359, 299 A.2d 356, 364 (1972) (Packel, J., concurring and dissenting) (citing *Petrie v. Kaufmann & Baer Co.*, 291 Pa. 211, 139 A. 878, 879 (1927)) ("[C]ommon carriers owe the highest degree of care to their passengers.... It is well settled by now that the operator of an escalator is a common carrier."); and *White v. Sears, Roebuck & Co.*, 242 F.2d 821, 823 (4th Cir.1957) (applying Virginia law) ("[I]n Virginia[,] owners of elevators are common carriers and held to the highest degree of care known to human prudence. The same law is elsewhere generally applied to owners of escalators as is applied to owners of elevators.").

4. *See Vandagriff v. J.C. Penney Co.*, 228 Cal.App.2d 579, 582, 39 Cal. Rptr. 671 (1964) ("An escalator in a department store is a common carrier" under California statute that requires "a carrier of persons" to exercise the highest degree of care for the passengers' safety); and *Metro. Atlanta Rapid Transit Authority v. Rouse*, 279 Ga. 311, 612 S.E.2d 308, 311 (2005) (by statute, defendant and its escalators were "carrier of passengers" and hence "must use extraordinary diligence to protect the lives and persons of its passengers").

1909) p. 148.) Carriers of goods are bailees and, at "early law goods bailed were absolutely at the risk of the bailee." (*Ibid.*) Thus, carriers of goods for reward were " 'responsible absolutely for the goods delivered, even when lost by theft, and regardless of negligence.' " (*Id.* at p. 149, fn. 4).  . . .

\*    \*    \*

The precursor to recognizing a heightened duty of care for carriers of persons came in 1680, when an English court applied the rule regarding carriers of goods to personal property that a passenger on a stagecoach had delivered to the driver, but which the driver failed to return at the end of the journey. (*Lovette v. Hobbs* (1680) 89 Eng.Rep. 836.) The court rejected the argument that the driver of a stagecoach could not be a common carrier regarding property brought by a passenger, stating: "[I]f a coachman commonly carr[ies] goods, and take[s] money for so doing, he will be in the same case with a common carrier, and is a carrier for that purpose, whether the goods are a passenger's or a stranger's . . . ." (*Id.* at p. 837.)

The extension of applying the heightened duty of care for carriers of goods to carriers of persons for reward "is probably of American origin, finding its earliest expression in 1839 in *Stokes v. Saltonstall* [38 U.S. (13 Pet.) 181, 10 L.Ed. 115, 1839 WL 4317 (1839)]." (3 Harper & James, The Law of Torts, *supra,* The Nature of Negligence, § 16.14, p. 507.) In *Stokes,* a passenger in a stagecoach was injured when the coach was upset. The court notes that a carrier of goods was absolutely liable for the loss of or damage to such goods regardless of the cause "except the act of God, and the public enemy," but recognized that "a contract to carry passengers differs from a contract to carry goods." (*Stokes, supra,* 38 U.S. at p. 191.) "But although he does not warrant the safety of the passengers, at all events, yet his undertaking and liability as to them, go to this extent: that he . . . shall possess competent skill; and that as far as human care and foresight can go, he will transport them safely." (*Ibid.*) Restating this standard, the court required

the driver to act "with reasonable skill, and with the utmost prudence and caution." (*Id.* at p. 193.)

29 Cal.Rptr.3d 352, 113 P.3d at 43 (footnote omitted).

Today the leading case in Maryland equating the duty owed to a passenger by the owner/operator of an elevator to that of a common carrier is still *Belvidere.* In *Belvidere,* the plaintiff, a guest at a hotel, was riding in an elevator that was manned by a Belvedere Hotel employee. 103 Md. at 526–27, 64 A. 44. The plaintiff was in the process of stepping out of the elevator onto the second floor when the elevator started downward, which caused the plaintiff to fall for a distance of twelve to fourteen feet. *Id.* The trial judge in *Belvidere* instructed the jury that the hotel owed the highest degree of care toward its elevator passengers. The question addressed in *Belvidere* was whether that instruction was correct.

The *Belvidere* Court said that the instruction accurately stated the law. It explained:

There appears to be an entire concurrence among the standard text writers upon this subject in supporting the instruction given in this case. *Shearman and Redfield on Negligence* state the law thus: "For the same reason—a regard for human life—that common carriers are required to exercise the highest degree of care for the safety of their passengers, irrespective of any contract of carriage, a like degree of care is exacted of a landlord in transporting persons by elevator between the several floors of his building. *He is therefore bound to use the greatest care, not only in providing, safe and suitable cars, appliances, and machinery for control, but also in managing these means of transportation.*" Vol. 2, § 719A. The passage cited from this author, § 719 in [*People's Bank v. Morgolofski,* 75 Md. 432, 23 A. 1027 (1892)], will be found to refer to elevator *shafts* left open as places of danger to those engaged near them, and not to the operation of the elevator itself as a means of transportation for those authorized to use it.

103 Md. at 535–36, 64 A. 44 (some emphasis added).

The *Belvidere* Court then proceeded to analyze cases from numerous other jurisdictions dealing with the duty owed to

passengers by the owner/operator of elevators. *Id.* at 536–40, 64 A. 44. The Court concluded its opinion by stating that it adopted the views expressed by the Supreme Court of Pennsylvania in *Fox v. Philadelphia,* 208 Pa. 127, 57 A. 356 (1904), because that decision was "grounded both in reason and authority." *Id.* at 540, 57 A. 356. The views expressed in the *Fox* case and adopted by the Court of Appeals were these:

> "The foundation of the rule for the protection of a passenger is in the undertaking of the common carrier which is to carry safely; but another reason for it is, that when the passenger commits himself to the carrier he does so in ignorance of the machinery and appliances (as well as their defects) used in connection with the means of transportation, and becomes a passive and helpless creature in the hands of the transportation company and its agents. For the same reason, this rule should be extended to those who operate elevators for carrying passengers from one story of a building to another. When they undertake to carry they undertake to carry safely. If it is not their express agreement to do so, it is surely an implied one, and the condition of a passenger caged in a suspended car, is one not only of utter ignorance of what has been done or ought to be done for his safety, but of absolute passiveness and pitiable helplessness when confronted with danger against which human knowledge, skill and foresight ought to have guarded; and the rule has been so extended."

*Id.* (quoting Fox, 57 A. at 358).

Twenty-four years after *Belvidere* was decided, the Court of Appeals, in *Richardson,* was once again called upon to examine the duty owed by an owner of an elevator toward its passengers. 158 Md. at 370–71, 148 A. 543. In *Richardson,* the plaintiff was injured as she was about to board a self-operated elevator. *Id.* at 371, 148 A. 543. According to the plaintiff, she shoved an elevator door aside and then encountered a "second door or gate of the elevator" that barred her entrance. *Id.* at 370, 148 A. 543. The second door had a

small knob, which the plaintiff took hold of to release the latch that controlled the entrance into the elevator car. The plaintiff testified that "she had barely touched the knob when the elevator door slammed back very rapidly, startling her, and catching her finger" in the door with such force "as to swing her around" as the door closed. *Id.* at 370–71, 148 A. 543. The plaintiff injured her fingers as a result of the action of the elevator door. In *Richardson,* the Court said:

> *The defendant was engaged in the carriage of its tenants and their servants and visitors by means of an automatic elevator, which was operated by those using it without any assistance, direction, or supervision by the defendant.* It was an economical method to cast the burden of its operation upon those having occasion to go to and from the several apartments of the six storied building, but the knowledge of the defendant that it would be run by a number of persons, who would represent a wide range of age, experience, intelligence, and capacity, *cast upon the defendant all the more care in the selection and maintenance of the mechanical device which was adopted by this general service.* The rule approved by this court is that the landlord *engaged in transporting passengers by elevators must exercise great care not only in their operation but in providing safe and suitable equipment.* It is a rule which has its sanction in sound public policy, which exacts a high degree of care where security of person and life is frequently involved, under circumstances in which the carrier is in control of the movement *or of the equipment. Belvidere Bldg. Co. v. Bryan,* 103 Md. 514, 534–540, 64 A. 44; *Shearman & Redfield on Negligence* (6th Ed.), § 719a and notes; *Cooley on Torts* (3rd Ed.), p. 1378.

The smallness of the knob and its closeness to the upright would naturally cause the fingers of the hand of the user to project and be caught and injured between the closing laths of the collapsible door, provided their movement was so rapid as not to afford a warning and opportunity for the

user to let go the knob and withdraw the fingers in time to avoid injury.

*Id.* at 371, 148 A. 543 (emphasis added).

In *O'Neill,* the plaintiff was in the defendant's store when she decided to exit an elevator that had been stopped by a store employee at the third floor. 172 Md. at 57, 190 A. 763. The floor of the elevator car, however, was approximately four inches above the level of the third floor. *Id.* According to the plaintiff, as she lifted her right foot to step to the floor of the building, the elevator dropped suddenly, causing plaintiff to lose her balance and to fall in such a manner as to cause the lower part of her back to strike the elevator car. *Id.* The Court, citing *Belvidere,* various text writers, and precedent from other states, said:

> Many authorities hold that one operating a passenger elevator is a common carrier, and the rule seems almost universal that the degree of care due by the owner of a passenger elevator to those who are expressly or impliedly invited to ride therein is similar to that which a common carrier owes its passengers.

*Id.* at 60, 190 A. 763.

The *O'Neill* Court went on to say that "the carrier of a person by elevator is required to exercise the highest degree of care and diligence to prevent injury to such person," *id.,* and that, in light of the rule set forth in *Belvidere,* the question as to the applicable duty of care was no longer "an open one in this state." *Id.* at 61, 190 A. 763.

In the subject case, Johns Hopkins argues:

> [T]he application of a common carrier theory of liability to modern building owners is no longer appropriate. Such a heightened standard of care may have been appropriate one hundred years ago when *Belvidere* decided the question as a matter of first impression. However, advancements in the elevator industry and distinctions between elevator owners and common carriers have dissolved many of the justifications for holding elevator owners to the heightened standard applicable to common carriers.

... [C]ommon carrier liability is no longer appropriate for elevator owners because human attendants have been replaced by automatic elevators. In the past, the presence of human attendants justified a heightened standard of liability for elevator owners in two respects. First, elevator attendants were hired, trained, and supervised by the building's owner, and acted as agents of the building owners. When elevators were operated by persons analogous to bus drivers, taxi drivers, or locomotive engineers, elevator owners bore more similarity to common carriers. Additionally, the presence of human attendants raised the risk of operation by introducing the element of human error. Today, the invention of the automatic elevator has eliminated the nexus between the elevator owner and the active negligence of the human attendant.

The passenger elevator was first made possible in 1853 when Elisha Otis invented a safety clamp that prevented elevator cars from falling if the hoist rope broke. 8 *New Encyclopedia Britannica* 1042 (1995). The first such elevator was installed in a building in the United States in 1857, about forty-nine years prior to the *Belvidere* decision. *Id. See also Dallas Mkt. Ctr. Dev. Co. v. Liedeker*, 958 S.W.2d at 384. As Johns Hopkins stresses, there have been many scientific advancements in elevator technology in the last century. But we fail to see why advancement in elevator technology should *reduce* the duty owed by owners/operators of elevators to elevator passengers. Such scientific advancements have not changed the fact that an elevator, if not maintained and operated with the highest degree of care, is now, as it was when *Belvidere* was decided, "in many respects a dangerous machine." *Belvidere*, 103 Md. 514, 64 A. 44. Moreover, the fact that technology has improved in the last century does not impact upon the main reasons the *Belvidere* rule was adopted in the first place, i.e., in almost all cases when a passenger steps into an elevator, he or she does so in ignorance of any defects that might exist in the appliance and is "a passive and

helpless creature in the hands of the" owner/operator of the device. *Id.*[5]

At the time *Belvidere* was decided, the highest degree of care was almost universally imposed in the United States on common carriers who transported human passengers. Since then, motor buses have replaced the stage coach, taxi cabs have replaced Hanson cabs, and overall transportation and safety technology has improved exponentially. Yet the duty owed by the common carrier to its passengers has remained constant. This being so, we can see no principled reason why the duty owed to an elevator passenger should be reduced simply because of technological advances.

We agree with appellant's point that, unlike the situation existing one hundred years ago when the *Belvidere* case was decided, almost all elevators in this country are now self-operated. We disagree, however, with Johns Hopkins' contention that the presence of a human elevator attendant in *Belvidere* constituted, in part, justification for the higher standard of care enunciated in that case. First, the higher standard of care mentioned in *Belvidere* was said to be imposed not only upon the elevator attendant but also upon the owner of the elevator who was required to "use the greatest care" in providing "safe and suitable cars, appliances, and machinery." 103 Md. at 535, 64 A. 44. This point was reinforced in *Richardson,* decided about seventy-five years ago, which dealt with a plaintiff injured while entering onto a self-operated elevator. 158 Md. at 371, 148 A. 543. In the *Richardson* case, the Court of Appeals affirmed a verdict in favor of the plaintiff and in doing so held that the elevator owner owed the highest degree of care not only in the operation of the elevator but also "in providing safe and suitable equipment." *Id.* That holding is important in this case because the primary act of negligence alleged against

---

**5.** Our research has uncovered no decision, and Johns Hopkins has referred us to none, that embraces the view of appellant that the common law rule imposing upon the owner/operator the highest degree of care for its passengers should be lowered because elevator technology has improved greatly since the rule was first adopted.

Johns Hopkins was that it did not provide safe and suitable equipment.

The Ohio Court of Appeals has ruled that the duty to exercise the highest degree of care

> is even more exacting in the case of automatic elevators because of their distinguishing features from manually operated elevators designed to be run by an attendant, where the automatic elevator is designed to be operated by its passengers without the assistance of a trained attendant, and because of these automatic features it is said that operating owners and ones under contract to service and inspect must act with a higher degree of care.

*Norman v. Thomas Emery's Sons, Inc.*, 7 Ohio App.2d 41, 218 N.E.2d 480, 482 (1966). We need not go so far as the Ohio Court of Appeals did in *Norman*. For our purposes, it suffices to say that we can see no good reason to reduce the duty owed by the owner of an elevator simply because the elevator installed is automatic rather than one operated by an attendant.

■ Appellant next argues that common carrier liability is now inappropriate because building owners no longer service and maintain their elevators. In this regard, Johns Hopkins stresses that it paid co-defendant Schindler Elevator Company, a licensed elevator contractor, $36,000.00 per month to ensure that the elevators on its property operated safely and effectively; moreover, argues appellant, Johns Hopkins, at the time of the accident, "was not an expert in the inspection, maintenance, repair, replacement, or safety of [its] elevators." By contrast, according to appellant, when *Belvidere* was decided, the Court was addressing a situation where the owner of the premises, the Belvedere Hotel, had its own engineer who maintained the elevators and was on duty at the time of the accident. *See Belvidere*, 103 Md. at 530, 64 A. 44. While Johns Hopkins does not say so directly, it impliedly argues that the duty to use the highest degree of care should be held to be delegable because it, unlike the licensed elevator contractor it hired, does not have the requisite expertise to

perform the necessary elevator maintenance and repair. While it may be true that Johns Hopkins is lacking in expertise—as far as elevator maintenance is concerned—it does not follow logically that it therefore does not have the duty of exercising the highest duty of care.

Appellant cites no case from any jurisdiction standing for the proposition that the higher duty of care is owed only in situations where the elevator owner performs its own maintenance and repair. Moreover, we can see no appropriate reason for such a rule, inasmuch as, in many elevator cases (including the one *sub judice*), one of the acts of negligence alleged against the owner/ operator is that the defendant failed to call in an expert to fix the elevator after it was put on notice that the elevator was malfunctioning.[6]

Additionally, in a number of cases from sister jurisdictions, which apply the same rule as set forth in *Belvidere,* the Court has held that the owners/operators had the duty to exercise the highest degree of care for the safety of their passengers, even though, in those cases, the owner had hired third parties to perform elevator maintenance work. *See Little Rock Land Co. v. Raper,* 433 S.W.2d at 840; *Kentucky Home Mut. Life Ins. Co. v. Wise,* 364 S.W.2d at 339; *Otis Elevator Co. v. Seale,* 334 F.2d at 929 (applying Louisiana law); *Cash v. Otis Elevator Co.,* 684 P.2d at 1042; *M & R Inv. Co. v. Anzalotti,* 773 P.2d at 730; *Norman v. Thomas Emery's Sons, Inc.,* 218 N.E.2d at 481; and *Smith v. Munger,* 532 P.2d at 1203–04.

For the foregoing reasons, we reject Johns Hopkins' argument that the rule first enunciated in *Belvidere* should be either overruled or modified simply because the owner/operator of the elevator has contracted with a third party to maintain and repair that device.

---

**6.** In *Otis Elevator Co. v. Embert,* the Court of Appeals said in dicta that the owner of the elevator owed a higher duty of care even though in that case the owner/operator had hired Otis Elevator Company to do its elevator maintenance and repair work. 198 Md. at 599–600, 84 A.2d 876.

Johns Hopkins also argues that the *Belvidere* rule should be overruled because "elevator transport shares little in common with carriers." Appellant's argument continues:

Maryland courts emphasize that common carriers are of a "public" nature; they have variously been described as satisfying an "urgent public need" serving the public "indiscriminately" and "affect[ing] the public interest." *Gunther v. Smith,* 78 Md.App. 508, 510, 553 A.2d 1314 ... (1989)....
Additionally, common carriers are obligated to "serve all who apply." *Id.* In contrast, Johns Hopkins is a private institution. Although Johns Hopkins elevators may well serve a large number of people, Johns Hopkins does not undertake to transport the public in the manner of a common carrier.

Additionally, unlike common carriers, elevator owners do not charge fares. Maryland case law has noted that the heightened standard available to common carriers arises in part from the fact that the passenger compensates the carrier for safe passage, thus creating a "contract of transportation." *St. Michelle v. Catania,* 252 Md. 647, 654, 250 A.2d 874 ... (1969) (plaintiff who was robbed and raped by taxicab driver was deemed a passenger because contract of transportation had not been completed); *Ragonese v. Hilferty,* 231 Md. 520, 526, 191 A.2d 422 ... (1963) (compensated carrier owes the highest degree of care to their passengers); *Belvidere[,]* 103 Md. at 539, 64 A. 44 ... (owner of building and elevator receive no compensation for transporting passengers and was not a common carrier).

Arguably at least, it may be true, as Johns Hopkins contends, that "elevator transport shares little in common with [common] carriers." There is usually no contract of carriage, fares are almost never charged, and ofttimes the public at large is not invited into the facility where the elevators are located. But the same was true when *Belvidere* was decided. Moreover, it should be noted that the *Belvidere* Court specifically said that the owner/operator of an elevator was *not* a common carrier. 103 Md. at 539, 64 A. 44. The court's reference to common carrier liability plainly was made in

order to show that the duties undertaken by the owner/operator of an elevator were the same as the responsibilities undertaken by a common carrier, and thus each should have a similar duty to protect their passengers from harm. *Id.* at 540, 64 A. 44 (quoting *Fox v. Philadelphia,* 208 Pa. 127, 57 A. 356 (1904)). See also language used by the *Belvidere* Court at 103 Md. at 535, 64 A. 44 ("For the same reason—a regard for human life—that common carriers are required to exercise the highest degree of care for the safety of their passengers irrespective of any contract of carriage—a like degree of care is exacted of a landlord in transporting persons by elevator between the several floors of his building.").

■ Johns Hopkins also claims that the higher duty of care set forth in *Belvidere* should be abandoned because that standard "has been applied to elevator owners [only] in a limited number of cases since its inception." This argument is unpersuasive. Unless a case can be distinguished on its facts, this Court does not have the option of disregarding Court of Appeals' decisions that have not been overruled, no matter how old the precedent may be.

Appellant's penultimate assertion concerning the court's instruction is that "there is case law in Maryland supporting the proposition that the duty of an elevator owner to a passenger is that owed by a property owner to an invitee." Johns Hopkins points out that in the case of *Swann v. Prudential Insurance Co. of America,* 95 Md.App. 365, 620 A.2d 989 (1993), *rev'd on other grounds sub nom. Dover Elevator Co. v. Swann,* 334 Md. 231, 638 A.2d 762 (1994), the jury was instructed that the elevator owner owed the plaintiff/invitee the duty of reasonable care. *Id.* at 416, 638 A.2d 762. In the course of a forty-nine page opinion, "[w]e perceive[d] no error" in giving the aforementioned instruction. *Id.* at 417, 638 A.2d 762. The "[w]e perceive no error" statement was made in response to the plaintiffs' contention that the court erred when it failed to instruct the jury that the property owner had "a non-delegable duty to correct all unreasonable risks, or to warn invitees of them, if they knew

or should have known of such risks." *Id.* at 416, 638 A.2d 762. Johns Hopkins maintains that the statement by the *Swann* Court implies that the rule set forth in *Belvidere* was considered to be no longer applicable. That argument has no merit. Plaintiffs' attorney in *Swann* never suggested that the rule first enunciated in *Belvidere* should be followed, and *Belvidere* and its progeny was not even mentioned in our opinion. Under such circumstances, the "we perceive no error" statement was non-binding dicta insofar as the *Belvidere* rule is concerned.

Lastly, Johns Hopkins contends that the instruction given by the trial judge concerning the heightened standard of care was bound to have confused the jury because the court also instructed as follows:

Now, an invitee is a person who is invited or permitted to be on another person's property for purposes related to the owner or occupant's business. The duty owed to an invitee is reasonable care to see that the portions of the property which the invitee may be expected to use are safe.

Appellant's counsel never contended at trial that the instructions were confusing. Thus, this issue is not preserved for review. *See* Md. Rule 2–520(e) ("No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection.").

In summary, we hold that in Maryland the legal principles first enunciated in *Belvidere* are still applicable. The owner of an elevator presently owes passengers the duty to exercise the highest degree of care and skill in operating and maintaining the device. The trial judge did not err in instructing the jury as to the duty owed by Johns Hopkins to Mrs. Correia.

## II.

Johns Hopkins also contends that on several occasions the trial court committed reversible error in allowing plaintiffs'

counsel to ask questions that should have been disallowed and in denying its motion for mistrial. The facts set forth in Section A below are pertinent to those issues.

## A.

Johns Hopkins, at all times here relevant, owned and operated 120 elevators. Four of those elevators were in the Nelson Building, which was located on the East Campus of Johns Hopkins Hospital.

For several years prior to July 1, 2000, appellant's elevators were maintained by Montgomery Kone Elevator Company. In the spring of 2000, however, Johns Hopkins put out for competitive bidding a contract for the maintenance of the elevators. The successful bidder was Millar Elevator Service Company, now known as Schindler Elevator Company (referred to hereinafter as "Schindler"). Schindler took over maintenance of the elevators on July 1, 2000, which was approximately two months before Mrs. Correia's accident.

Prior to the acceptance of its bid, Schindler proposed to install new equipment in the four Nelson Building elevators. The exact work to be performed was not mentioned, however, nor was a specific price set.

On August 30, 2000, Jane Correia was a passenger on Elevator No. 2 in the Nelson Building. This slow-speed (357 feet per minute) elevator was descending from the fifth to the first floor when it came to an unexpected and abrupt stop. Mrs. Correia, who had previous back problems, immediately complained of significant pain in her back due to the jolt she received as a result of the stop. She was taken by wheelchair to the Johns Hopkins Emergency Room and later underwent surgeries due to injuries she claimed were caused by the elevator's malfunction.

Sometime in September 2000, two representatives of Schindler inspected the four elevators in the Nelson Building.[7] The

---

7. At trial, counsel for plaintiffs and counsel for Schindler indicated in a bench conference that the date of the inspection was September 6,

inspection was not as a result of Mrs. Correia's accident. Instead, the inspection was made as a follow-up to the proposal Schindler made before it was awarded the maintenance contract by Johns Hopkins. The purpose of the inspection was to allow Schindler to make a proposal concerning what upgrades were needed in the four Nelson elevators, to specify the exact work that needed to be performed, and to propose a price.

One of Schindler's representatives who inspected the elevators in September 2000 was Charles Stump ("Stump"). He supervised other Schindler mechanics who worked at Johns Hopkins to make sure they did their jobs properly, and he was Schindler's man in charge of the elevators at Johns Hopkins.

When Stump made his September 2000 inspection, he did so in the company of one of Schindler's elevator mechanics. After the inspection, Stump prepared an "upgrade/repair proposal" and sent it to Johns Hopkins on October 6, 2000—about five weeks after the subject accident. This upgrade/repair proposal (hereafter "the October 6 report") was marked for identification at trial as plaintiffs' Exhibit 54. It was not, however, introduced into evidence.

At trial, Stump was asked numerous questions about the observations he had made concerning the four Nelson elevators as reflected in the October 6 report. In the excerpt from the report set forth below, we have emphasized the portion of plaintiffs' Exhibit 54 about which Stump was asked questions:

REPLACE CAR DOOR GIBS

*The [elevator] car door gibs, which are what guide the door panel in alignment, are very worn or damaged.* These gibs should be replaced with new ones to prevent car door problems and costly repairs.

REPLACE CAR DOOR HANGERS

*Your elevator car door hangers are worn, damaged or do not meet current safety standards.* To meet code and avoid

2000, but in front of the jury the date of the inspection was referred to as "sometime in September 2000."

undue and costly breakdowns, they should be replaced with modern hangers.

REPLACE CAR DOOR CLUTCH

The existing car door clutch assembly shall be replaced in order to facilitate the installation of the new door operator and associated equipment.

HOISTWAY:

REPLACE DOOR OPERATOR

> *Your door operator no longer meets safety code. It is worn, damaged* and components are becoming increasingly more difficult to obtain due to [obsolescence]. To achieve reliable as well as safe operation, your existing door operator should be replaced with a current model.

REPLACE HOISTWAY DOOR INTERLOCKS

*The present interlocks are damaged, or do not comply with current code requirements. This presents a potential safety hazard.* The interlocks should be replaced with new ones.

REPLACE HOISTWAY DOOR HANGERS

*The present door hangers are worn, damaged or do not meet current safety standards.* They should be replaced with hangers conforming to current code requirements.

REPLACE HOISTWAY DOOR GIBS

*The present door gibs, which are what guide and hold the door panel in alignment, are worn or damaged.* To avoid door opening/closing problems, new gibs should be installed.

> \*     \*     \*

(Emphasis added.)

At trial, Patrick McPartland, an elevator expert called by plaintiffs, explained that an elevator interlock device is a mechanism that insures that the elevator will not run with the door open. He opined that the subject accident occurred when "the [descending] elevator clipped the interlock" and caused the elevator to come "to an unexpected abrupt stop and reverse directions." He further testified that it was unusual for an elevator, such as the one in which Mrs. Correia was

riding, to come to such an abrupt stop. In Mr. McPartland's opinion, the reason that the interlock mechanism was "clipped" by the elevator was because "the door components, the roller, the gibs [, the devices that guide and hold the door panels in alignment, as well as other] . . . components of the door were not properly maintained. [and were] broken or in bad condition" at the time of the accident.

### B. *The Court's Grant of a Continuing Objection*

On October 4, 2005, which was the first day of trial, counsel for Schindler and Johns Hopkins jointly voiced their concern that plaintiffs' attorney might attempt to introduce into evidence testimony concerning the fact that after the accident Johns Hopkins had "modernized" the elevators in the Nelson Building.[8] Counsel for the Correias assured the court that the plaintiffs did not intend to introduce evidence of subsequent remedial repairs. One of the plaintiffs' counsel said, however, that he did intend to say in opening statement that (1) Stump inspected the elevators in the Nelson Building and prepared a report (i.e., plaintiffs' Exhibit 54) based on that inspection; and (2) Stump said in his deposition that the worn and damaged condition of the elevator components in the Nelson Building that he saw when he inspected the elevators were not conditions that occurred overnight but instead were conditions that would have been in existence for at least two months before his inspection. The court ruled that counsel could relate in opening statement what Stump observed when he inspected the elevators, but post-accident repairs or post-accident repair recommendations could not be mentioned. At

---

8. Johns Hopkins says in its brief that it and Schindler filed, on September 30, 2005, a motion *in limine* based on Maryland Rule 5–407 "to exclude any documents, testimony and arguments concerning subsequent remedial measures" taken by the parties. We have reviewed the docket entries and the record, and have been unable to find any indication that such a motion was filed. But whether such a motion was filed or not is of no moment, because at trial the court granted a similar oral motion, which prohibited counsel from asking questions about subsequent repairs and post-accident recommendations for upgrades or repairs.

that point, defense counsel did not object to the court's resolution of the issue.

On the second day of trial, plaintiffs' counsel called Stump as a witness. Counsel for both defendants made an oral motion *in limine* in which they objected to plaintiffs' counsel's being allowed to ask Stump about the observations he made in September 2000. The first ground for exclusion raised by defense counsel was that Stump's September 2000 observations as to the condition of the elevators were not relevant to an accident that occurred prior to those observations. The second ground for objection was that the testimony of Stump about his September observations ran afoul of Maryland Rule 5–407, which, with certain inapplicable exceptions, prohibits introduction of evidence concerning remedial repairs made post-accident.

The court ruled that Stump would not be allowed to testify as to any post-accident repairs or recommendations for repairs. Concerning the relevancy of Stump's observations made in September 2000, the court said that the observations were relevant because (according to appellant's counsel's proffer) the worn and defective condition of the elevator components "obviously didn't just get that way overnight" and therefore represented the condition of the elevators when the accident occurred.

Stump testified on direct examination that he had worked about twenty years in the elevator industry and had been trained, for about three-and-one-half years, as an apprentice elevator mechanic. As an apprentice, he served as a helper to mechanics and learned how elevators worked. Since 1989, he had worked as an elevator sales representative whose duties included advising customers as to what they needed to do in terms of preventative maintenance for elevators. When he prepares proposals concerning the condition of a customer's elevator, like he did when he prepared his October 6 report, he does so with the assistance of a mechanic superintendent, i.e., a person who supervises other elevator mechanics. The proposals he prepares include, without direct attribution, ob-

servations made by the maintenance superintendent. The proposals are based on Stump's expertise and that of the maintenance superintendent. At that point of Stump's testimony, a bench conference occurred, and the trial court granted both defense counsel "a continuing objection" to any questions put to Stump regarding the observations he made in September 2000, as reflected in the October 6 report he signed.

On direct examination, Stump was asked whether "after July 1, 2000," he, along with an elevator maintenance superintendent, performed an inspection of the door equipment in the elevators located in the Nelson Building. Initially, Stump said he could not remember doing such an inspection. His memory improved when he was shown Exhibit 54, which he admitted he had written. Stump then attempted to evade responsibility for statements that appear in the report by saying that the report was written based on a computer program, which he called a "macro system," whereby one simply "clicked ... a mouse" and the computer caused the statements in the report to be made. According to Stump, the words spewed forth by the computer could not be edited. For obvious reasons, that explanation was not accepted by plaintiffs' counsel. Eventually plaintiffs' counsel was successful in casting substantial doubt on the veracity of the "macro system" excuse when he and Stump engaged in the following exchange.

PLAINTIFFS' COUNSEL: Now, let's talk a little bit about this observation that you put in your report, observation that you arrived at based on your inspection in September. You had to affirmatively hit a key or button or something to make that statement appear in that report, correct?

A. Yes.

Q. So it took intentional acts by you to make sure something goes into the report?

A. Yes.

Q. You are not testifying in front of the members of the jury that was some kind of wild mistake that that language was in this report, right?

A. No.

Q. And you are also telling these ladies and gentlemen of the jury, that the language that went into this report was language you wanted to be in there, correct?

A. Correct.

*     *     *

Q. You signed this report at the end, correct?

A. Yes.

Q. You testified both in deposition and today that every word in that report was true and accurate; is that correct?

A. That's my testimony, yes.

Q. You also read through this document before you sent it out, did you?

A. Yes.

Q. Make sure it wasn't [sic] a typo?

A. Yes.

Q. Make sure there wasn't a factual mistake?

A. Yes.

While on direct examination, plaintiffs' counsel steered clear of any question that might elicit a response from Stump indicating what repairs he had recommended. Instead, the examination focused on statements made in the report as to the condition of the elevators in the Nelson Building that he observed, e.g., "gibs are very worn or damaged," car door hangers "are worn, damaged, or do not meet current safety standards," "present interlocks are damaged, or do not comply with current code requirements ... present[ing] a potential safety hazard." In regard to the problem with the interlocks, Stump testified, without objection, that if the interlock is worn or damaged this creates a safety hazard because it can cause the elevator to make an abrupt, unexpected stop. Stump further testified on direct examination that, based on his

observations, the problems he observed were "longstanding" and were present "even before July of 2000."

Shortly before direct examination was concluded, plaintiffs' counsel asked Stump to read to the jury what he had written concerning his observations of the "hoistway door hangers . . . door gibs and . . . door rollers." His answer to that question was: "The present door hangers are worn, damaged, or do not meet current safety standards. This is replaced—" Counsel for Johns Hopkins asked that the answer be stricken. The motion was granted, and the jury was immediately instructed as follows:

> Ladies and gentlemen, any testimony offered with respect to what should have been done with respect to observations of conditions, you are not to consider. That is not something of a factual nature that should be before you. You are to disregard it.

On cross-examination by Schindler's counsel, it was brought out, for the first time, that the report plaintiffs' counsel had been questioning Stump about was dated October 6, 2000, and that the inspection that resulted in the report was made "a few days before" the report was sent. Schindler's counsel then asked Stump:

> Now, let's start with the first thing he asked you about which was *replacing* car door gibs, that is in that document you have there in front of you; is that correct?

(Emphasis added.)

After Stump answered that question in the affirmative, the court asked counsel to approach the bench. The trial judge then admonished Schindler's counsel as follows:

> Counsel, I thought I had been very careful in limiting the testimony to what was worn and damaged. And I thought the only reference that . . . had made to replacing something, I struck from the record. I mean, you seem to be opening everything that you asked me to keep closed. In other words, you have asked me to make sure the jury didn't hear anything about replacing anything, any remedial steps, and your very question, before he responded to,

couched in the context of a remedial action. So I need to know where we are. If [you] did abandon that issue, so be it. If not, let me know.

Schindler's counsel told the court that his question had been asked inadvertently and requested that the court tell the jury to disregard the question and the answer. The trial court did so.[9]

Shortly after the jury was told to disregard Stump's answer concerning the need to replace certain elevator parts, Stump said in another of his answers that at the time he wrote Exhibit 54 it "made sense to do that upgrade at that time." Although neither defense counsel objected, the court immediately called counsel to the bench and once again scolded Schindler's counsel for bringing out the fact that Stump had recommended that parts be replaced. This prompted counsel for Johns Hopkins to ask for a mistrial

because of the jury being told the equipment is obsolete and needs to be replaced, that recommended by [Schindler], that's the whole basis of [the rule barring evidence of] subsequent remedial measures. We have to deal with the door being opened. That is a violation in the courtroom. I just don't see how you can unring the bell at this point.

\* \* \*

... I would just add, this is the second time, that's the second, not the first time, second time that we have heard referred to replacing parts of the elevator. *I think the court made the right decision keeping out the subsequent remedial measures. Since the court was very careful and excluding anything about that, and I think the court's ruling that only the portion of that report that the founda-*

---

**9.** The court said:

Members of the jury, before we took that momentary recess, there was a question posed by [Schindler's counsel] with respect to something being replaced. That is an issue that is not before you. You shouldn't even consider anything that's with regard to anything that could have been done. We are only to focus on the question asked, and what the evaluation and inspection reveal.

*tion is laid, that the equipment, the condition of the equip-ment before August 30th was admissible, and I think that was handled at very [sic] direct examination by [plaintiffs' counsel] of his witness.* But when we start talking about replacement, at least twice now, the jury has to have the inference, pretty clearly, [Schindler] recommended this, and even if the date comes out, it's ultimately after August. So I think the case law is very clear that the information should not have come in.

(Emphasis added.)

The court denied the mistrial motion but instructed the jury as follows:

Ladies and gentlemen, you are to disregard any reference to anything that should be replaced or anything that should be done. You are not to consider that at all.

Counsel for Johns Hopkins then cross-examined Stump and got Stump to say on three separate occasions that the report he authored was written on October 6, 2000, which was after the subject accident. Plaintiffs' counsel, on re-direct examina-tion, once again elicited testimony from Stump that the report was based on observations made post-accident. Later, on further examination by Johns Hopkins counsel, the same point was again driven home when Stump said twice more that the report was written after the accident.

### III.  *ANALYSIS*

Johns Hopkins argues:

The trial court abused its discretion in admitting the October 6, 2000[,] Upgrade/ Repair Proposal from Mr. Chas Stump, of [Schindler], to Johns Hopkins ("the Proposal"), as Plaintiffs' Exhibit 54.

This argument is without merit because plaintiffs' Exhibit 54 was not admitted into evidence.

Alternatively, Johns Hopkins contends that the court erred in allowing plaintiffs' counsel to question Stump about what he observed in September of 2000 as reflected in his October 6

report.[10]   According to appellant, the observations Stump made in September 2000 were irrelevant because "Johns Hopkins did not have knowledge of the information contained . . . in [Exhibit 54] at the time of the incident." In this appeal, Johns Hopkins stresses that the evidence was uncontradicted that (1) Schindler never advised it prior to the accident "that Elevator 2 was unsafe for use" or (2) that Johns Hopkins had no pre-accident knowledge of the unsafe conditions referenced in the October 6, 2000, proposal.

■   This argument overlooks the fact that Schindler was a co-defendant and that Stump was Schindler's man in charge at Johns Hopkins. Schindler was sued on the theory that it was negligent in its maintenance of the elevators in the Nelson Building. As to Schindler, Stump's September 2000 observations were highly relevant because, according to Stump, the worn and defective condition of the elevator parts had existed for at least two months before his inspection. Those conditions therefore existed when the subject accident occurred.

Beginning on July 1, 2000, Schindler had three full-time mechanics on duty whose sole job was to maintain the elevators owned by Johns Hopkins. Schindler's agents inspected all of the elevators at Johns Hopkins in June 2000, and its mechanics thereafter regularly worked in and around the elevators in the Nelson Building. Arguably, at least, if the observations made by Stump in September of 2000 were true, a reasonable juror could conclude that Schindler's agents should have discovered the defective conditions of the eleva-

---

**10.** In its brief, Johns Hopkins also argues that the court erred in permitting plaintiffs' counsel to use plaintiffs' Exhibit 54 to question "Al Ringer," an elevator technician employed by Schindler. According to appellant's brief, these questions were allowed despite "defendants' repeated objection." Mr. Ringer was asked questions based on the observations Stump recorded in Exhibit 54, but those questions were not objected to and were asked prior to the time defense counsel were given a continuing objection to such questions. Thus, the issue of whether the court erred in respect to Ringer's testimony is waived. *See* Md. Rule 2–517(a) (an objection is waived unless it is made at the time the evidence is offered or as soon thereafter as the grounds for the objection become apparent).

tors and warned Johns Hopkins about those conditions prior to the subject accident.

Additionally, the post-accident observations of Stump were relevant because it helped plaintiffs show what caused the accident and gave meaning to the expert opinions rendered by McPartland and other knowledgeable witnesses who said that worn or damaged elevator door equipment—clutches, interlocks, hangers and other components—can cause an elevator to stop abruptly, as it did on the date of the subject accident.

Appellant asserts that while Stump's testimony regarding his September 2000 observations might "arguably" have been admitted "to implicate [Schindler's] knowledge of the [elevator] door equipment" prior to the accident, Stump's knowledge "should not have been imputed to Johns Hopkins because before the accident it was unaware of these conditions." The short answer to that contention is that, at least as far as is shown in the record, no one at trial ever attempted to impute Stump's knowledge to Johns Hopkins. In fact, the opposite was covered specifically by the court's instructions. The jury was told:

> On the issue of whether Johns Hopkins was negligent, you are not to consider any evidence about the condition of Nelson Elevator No. 2 that was made known to Hopkins by [Schindler] after the incident of August 30, 2000.

Appellant next argues:

> [T]he trial court prejudiced Johns Hopkins by permitting [p]laintiffs to question Stump for an extended period of time about ... [plaintiffs' Exhibit 54] without referencing the October 6, 2000[,] date. The date's redaction was an attempt to avoid introducing evidence of subsequent remedial measures. *However, the redaction gave the jury the impression that Johns Hopkins knew of the conditions in the Proposal at the time of the August 30, 2000[,] incident.* The first and only question [p]laintiffs asked Stump regarding the date of the Proposal was, "You done [sic] an inspection of the Nelson elevator door equipment after June, after July 1st of 2000; is that correct?" Stump

answered affirmatively, and the obvious inference was that the inspection had been done after July 1, 2000, but *before* August 30, 2000. Such an impression was highly prejudicial to Johns Hopkins, and as is discussed below, was not capable of being cured through the issuance of a limiting instruction.

(Reference to extract omitted.) (Emphasis added.)

We reject the suggestion that, at the end of the evidentiary phase of the case, any juror had been misled into believing that Johns Hopkins knew of the contents of the proposal pre-accident. Stump told the jury on seven separate occasions that the report he prepared was dated October 6, 2000. The jury also was told repeatedly that the subject accident occurred on August 30, 2000. Moreover, Stump said, several times, that the observations that formed the basis for the report were made in September of 2000. Under such circumstances no juror could possibly have missed this point.

Johns Hopkins next argues that, even assuming that testimony concerning Exhibit 54 had some probative value, that value was outweighed by its prejudicial effect because (1) Exhibit 54 was not based on an opinion by an expert; (2) it was not based on Stump's personal observations of the elevator's internal equipment; (3) Stump's opinions as to the condition of the elevator equipment was of limited value inasmuch as it was based solely on the age of the equipment, coupled with his observation of the opening and closing the elevators doors; and (4) Exhibit 54 was merely a product of a "computer-generated 'macro system.'"

We shall first address appellant's assertion that "[t]he low probative value of this computer-generated document did not outweigh the prejudice engendered by" testimony concerning it. In *Thomas v. State,* 397 Md. 557, 579, 919 A.2d 49, 62 (2007), the Maryland Court of Appeals reiterated the rule that governs this issue. The Court said:

Petitioner argues that even if the evidence is relevant and admissible, the prejudicial effect of the evidence outweighed

its probative value, and therefore, the evidence should have been excluded. We disagree.

The admission of evidence is committed to the sound discretion of the trial court and will not be reversed unless there is a clear abuse of discretion. *Kelly v. State,* 392 Md. 511, 530, 898 A.2d 419 (2006); *Merzbacher v. State,* 346 Md. 391, 404–05, 697 A.2d 432 (1997). We stated in *Merzbacher v. State,* as follows:

> "At the outset, we note that the admission of evidence is committed to the considerable and sound discretion of the trial court. In that regard, all relevant evidence is generally admissible. A corollary to that rule is that irrelevant evidence is not admissible. To be relevant, evidence must tend to establish or refute a fact at issue in the case. Once a finding of relevancy has been made, we are generally loath to reverse a trial court unless the evidence is plainly inadmissible under a specific rule or principle of law or there is a clear showing of an abuse of discretion.
>
> Nonetheless, as we said in *Williams [v. State,* 342 Md. 724, 737, 679 A.2d 1106 (1996), overruled on other grounds, *Wengert v. State,* 364 Md. 76, 89 n. 4, 771 A.2d 389 (2001)]:
>
> '[a] finding by the trial judge that a particular piece of evidence is relevant, however, does not mean that evidence is *automatically* admissible. Even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. As with the trial court's relevancy determination, a decision to admit relevant evidence over an objection that the evidence is unfairly prejudicial will not be reversed absent an abuse of discretion.' "

*Merzbacher,* 346 Md. at 404–05, 697 A.2d 432 . . . (emphasis in original) (some internal citations omitted). The trial judge considered the evidence and ruled it admissible. We agree with the Court of Special Appeals['] conclusion that "any possible prejudicial effect of [the evidence at issue] did not so clearly outweigh the probative value of

the evidence so as to render the circuit court's admission of the evidence an abuse of discretion." *Thomas [v. State]*, 168 Md.App. [682,] 713, 899 A.2d 170 [(2006)]. We find no error.

*Id.*

Johns Hopkins' argument, when reduced to its essence, is that Stump, who was not admitted at trial as an expert, simply did not know what he was talking about when he criticized the condition of the elevators in his October 6 report.

Stump, at the time of trial, worked for Schindler. When plaintiffs' counsel tried to qualify Stump as an expert, the witness gave a series of answers making it appear that, even though he signed the October 6 report, he was not an elevator mechanic and the opinions he set forth in that report resulted from only a cursory examination of the elevators. At a bench conference, prior to allowing questioning regarding the observations set forth in the report, plaintiffs' counsel said that at deposition Stump never indicated that he had a limited role in writing the report; plaintiffs' counsel also pointed out, accurately, that Stump was an authorized agent of Schindler and that the statements in the report, as to Schindler, constituted an admission, which bound that defendant.[11] The trial judge concurred with the argument that Stump's statements were admissible as an admission against Schindler; the court also made the observation that Stump "seem[ed] to be making an effort to protect his employer." The trial judge went on to say:

> It would be utterly inappropriate ... [in light of] this report, which is so clearly written, and so definitive in the way it is written, to then let this man try to get on the stand and basically deny this report or deny any responsibility for the report and put it on some sudden development that was never brought to anyone's attention.

---

11.  *See B & K Rentals & Sales Co. v. Universal Leaf Tobacco Co.*, 324 Md. 147, 162, 596 A.2d 640 (1991).

After voir dire, the extent to which Stump was willing to stand by what was said in the report varied depending on who was asking the questions. When Schindler's counsel posed the questions, Stump said he was no expert, that he never examined the internal mechanisms to the elevators, that the statements in the report were based mainly on the age of the elevators, that prior to writing the report he only rode the elevators and examined the exteriors of the doors, and that the report was computer generated and afforded him no ability to edit it. But when examined by plaintiffs' counsel, Stump swore that everything he wrote in the October report was true *and accurate;* he also admitted that, although the report was written on a computer, "the language that went into [the] report was language" he wanted.

Using the test set forth in *Thomas,* we cannot say that the possible prejudicial effect of allowing Stump to be questioned about the report "so clearly outweigh[ed] the probative value of the evidence so as to render the circuit court's admission of the evidence an abuse of discretion." *Thomas,* 397 Md. at 580, 919 A.2d at 63 (quoting *Thomas v. State,* 168 Md.App. at 713, 899 A.2d at 189).[12]

---

**12.** There is another serious flaw in appellant's argument that the "slight" probative value of the testimony at issue was outweighed by its prejudicial effect.

The prejudicial effect of the testimony to which appellant directs our attention in his brief was that, during questioning of Stump about his report, the jury learned of remedial repairs. But when the trial judge made his decision to give defense counsel a continuing objection to any question regarding Stump's September 2000 observations, the judge did not know, and had no way of predicting, that the report would prejudice Johns Hopkins. In this regard, it should be remembered that, before granting defense counsel a continuing objection, the court told counsel that, although they could question Stump about the observations he made in September 2000, Stump could not be asked about post-accident recommendations as to steps that should be taken to modernize the elevators. After the continuing objection was granted, defense counsel made no further objection. Thus, at the time the court made the ruling that appellant criticizes on appeal, the court had no prejudice to balance against what appellant calls the slight probative value of the observations made by Stump in his report.

At oral argument, appellant's counsel said that the "prejudicial effect" about which appellant complains is the prejudice caused by all the questions to which the defendants were given a continuing objection.

## IV.

Appellant argues that the trial court committed reversible error in denying its motion for mistrial. The motion for mistrial was based on three answers given by Stump. The first answer occurred when plaintiffs' counsel asked Stump to read to the jury what he had said concerning his observations of certain elevator door components. Unfortunately, Stump did not read precisely what he had written. Instead he said that "the present door hangers are worn or do not meet current safety standards. This is replaced—" The judge evidently construed that answer as indicating that Stump had recommended replacement. Accordingly, at appellant's request, the jury was told to disregard "any testimony offered with respect to what should have been done" as a result of observations the witness made.

The second problem arose when Stump gave an affirmative answer to a question asked by Schindler's counsel that indicated that the report Stump prepared had recommended *replacing* "car door gibs." The court promptly told the jury that they were to focus on what "the evaluation[s] and inspection reveal[ed]" and not about "something being replaced."

The third problem, and the one that prompted a mistrial request, was when Stump said that at the time he wrote Exhibit 54 "it made sense to do an upgrade." Although the motion for mistrial was denied, the court once again told the jury that they were to disregard any statement by the witness concerning anything "that should be replaced."

Whether to order a mistrial rests in the discretion of the trial judge, and appellate review of the denial of the motion is limited to whether there has been an abuse of discretion.

---

That prejudice, as we understand appellant's oral argument, was that the testimony may have led the jury to believe that appellant, prior to the accident, had *actual knowledge* of the condition of the elevators mentioned in the October 6 report. We fail to see any possibility of such prejudice in light of a jury instruction specifically on this point, coupled with the fact that after Stump left the stand it was crystalline that Stump never reported to appellant the bad condition of the elevator doors until after the accident.

*State v. Hawkins,* 326 Md. 270, 277, 604 A.2d 489 (1992). The question is one of prejudice. *Rainville v. State,* 328 Md. 398, 408, 614 A.2d 949 (1992); *Hawkins,* 326 Md. at 276, 604 A.2d 489. . . . Where the motion is denied and the trial judge gives a curative instruction, we must determine " *'whether the evidence was so prejudicial that it denied the defendant a fair trial;* ' that is, whether 'the damage in the form of prejudice to the defendant transcended the curative effect of the instruction.' " *Rainville,* 328 Md. at 408, 614 A.2d 949 . . . (quoting *Kosmas v. State,* 316 Md. 587, 594, 560 A.2d 1137 (1989)). . . .

*Med. Mut. v. Evans,* 330 Md. 1, 19–20, 622 A.2d 103 (1993) (emphasis added).

The three statements at issue were made in the course of a nine-day trial. Each time Stump touched on the subject of either recommendations for. replacing parts or actual post-accident replacement of elevator parts, the jury was told immediately to disregard the testimony. Jurors are presumed to have understood and to have followed the court's instructions. *See State v. Gray,* 344 Md. 417, 425 n. 6, 687 A.2d 660 (1997). Although that presumption can be overcome, here there is nothing in the nature of the testimony that the jury was instructed to disregard that leads us to believe that the presumption was rebutted especially in light of the fact that the curative instructions were both timely and accurate. *See Cooley v. State,* 385 Md. 165, 173, 867 A.2d 1065 (2005); *Kosh v. State,* 382 Md. 218, 226, 854 A.2d 1259 (2004).

In *Cooley,* Judge Cathell, speaking for the Court, said:

Many years ago, in evaluating the possible prejudicial effect of the admission of specific evidence in a particular case, this Court stated:

"Generally, the choice of measures to protect the fair, unprejudiced, working of its proceedings is left to the discretion of the trial court, and only in exceptional cases will its choice be reviewed in this court. In the greater number of instances the injection into a trial of matter other than that involved in the issue to be decided is cured by

withdrawal of it and an instruction to the jury to disregard it, but there may, of course, be instances in which it would not be cured in this way, and terminating the trial and taking the case up afresh before another jury would be the only adequate means of correction. Those instances are exceptional, but they do arise."

*Nelson v. Seiler*, 154 Md. 63, 72, 139 A. 564 (1927).

As we have indicated, a trial judge is afforded considerable discretion in deciding a motion for mistrial, and "in a case involving a question of prejudice which might infringe upon the right of the defendant to a fair trial, [that decision] is reviewable on appeal to determine whether or not there has been as abuse of that discretion by the trial court in denying the mistrial." *Wilhelm [v. State]*, 272 Md. [404,] 429, 326 A.2d 707 [(1974)] (alteration added). *See also Tierco Maryland, Inc. v. Williams*, 381 Md. 378, 849 A.2d 504 (2004)....

385 Md. at 174–75, 867 A.2d 1065.

The reason why appellate courts are loath to second-guess a trial judge who denies a mistrial motion was explained in *State v. Hawkins*, 326 Md. 270, 278, 604 A.2d 489 (1992):

The fundamental rationale in leaving the matter of prejudice *vel non* to the sound discretion of the trial judge is that the judge is in the best position to evaluate it. The judge is physically on the scene, able to observe matters not usually reflected in a cold record. The judge is able to ascertain the demeanor of the witnesses and to note the reaction of the jurors and counsel to inadmissible matters. That is to say, the judge has his finger on the pulse of the trial.

As shown by the above cases, in determining whether to grant a mistrial based on the fact that the jurors heard evidence that should not have reached their ears, the court must consider "whether the damage in the form of prejudice to the [complaining party] transcended the curative effect of the instruction." *Med. Mut. v. Evans*, 330 Md. at 19, 622 A.2d 103 (quoting *Kosmas v. State*, 316 Md. 587, 594, 560 A.2d 1137 (1989)).

"The applicable test for prejudice is whether we can say, 'with fair assurance, after pondering all that happened without stripping the erroneous actions from the whole, that the judgment was not substantially swayed by the error.' The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error."

*Wilhelm v. State,* 272 Md. 404, 416, 326 A.2d 707 (1974) (citations omitted).

From the record, it does not appear that this was a "close case" as to whether Johns Hopkins exercised the highest degree of care for Mrs. Correia's safety. There was strong evidence that it had not met its duty—especially in light of the numerous complaints about Nelson Elevator No. 2—in the six months prior to the accident. The case, it appears, was "close" as to the issue of causation in that there was room for doubt as to whether an abrupt stop of a low-speed elevator could have caused the extensive injuries claimed. The statements by Stump that resulted in a mistrial motion did not involve the causation issue. Moreover, the steps the trial court took to mitigate the damage caused by the objected-to evidence was prompt and clear. Applying the three-factor test enunciated in *Wilhelm,* we cannot say that the trial judge abused his discretion in denying the motion for mistrial.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY JOHNS HOPKINS HOSPITAL AND JOHNS HOPKINS HEALTH SERVICE COMPANY.**