633 A.2d 924

**Sharon Bovy MAXWELL et al.**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY et al.**

**No. 428, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Dec. 7, 1993.

George N. Elfter of Washington, DC (Arthur E. Neuman and Wolk & Neuman, on the brief), Takoma Park, for appellants.

Gerard J. Stief (Robert J. Kniaz, on the brief), Washington, DC, for appellee, WMATA.

Argued before BISHOP, FISCHER and CATHELL, JJ.

CATHELL, Judge.

Sharon Bovy Maxwell and James Maxwell, appellants, appeal from the trial court's granting of a "directed verdict" in their negligence suit, finding that Washington Metropolitan Area Transit Authority (WMATA), appellee, had immunity from liability.[1] Appellants present three questions supported by several numbered arguments. We consolidate and rephrase the issues as:

1. Whether the evidence offered by appellants below was directed at WMATA's alleged negligent design.

2. Whether WMATA has immunity from suit based upon negligent design.

We shall affirm. We hereafter explain, but are first constrained to comment on appellees' use of transcript references rather than extract references.

Prior to the adoption of the 1993 amendment to Maryland Rule 8–501, the parties in a civil case were required to include the relevant portions of the record in the extract or risk dismissal. This was to ensure that each appellate judge sitting on a case had the necessary reference material readily available. The requirement that relevant portions of the record be included in the extract still remains. The 1993 amendment merely reduces the risk of dismissal by adding to Maryland Rule 8–501 this language: "The fact that a part of

---

[1] The jury found in favor of the remaining defendant, Montgomery County, Maryland, and the third party defendant, Dustin Construction, Inc. (Dustin). Another claim by another plaintiff, Margaret C. Noble, was resolved prior to trial.

the record is not included in the record extract shall not preclude a party from relying on it or the appellate court from considering it." Appellee has been quick to take advantage of the amendment. In its brief, it cites to the extract twice and to the record (transcripts) twenty-five times.

The writer for the panel thus must either circulate the record to the other two panel members or copy the non-extract material to give to the other panel members for their review. The record of these proceedings comprises four circuit court file folders, six transcripts, and two folders of exhibits. The transcripts are 117 pages, 263 pages, 307 pages, 219 pages, 174 pages, and 9 pages for a total of 1,090 pages. The record probably weighs 30 to 40 pounds.

Rather than referring to one extract available to each of us, we have had to jump from one transcript to another, sometimes to several on one issue. We fear that if this type of transcript reference becomes a trend, we will spend more and more time "finding things" and less and less time "resolving things."

It is inefficient not to have the relevant information in one extract available to all judges. To have numerous direct references to the record, which can be in the possession of only one judge at a time and needs to be circulated to two other judges is, moreover, inefficiency incarnate, especially where, as in this case, one judge is in Wicomico County, one in Baltimore County, and one in Annapolis.

If the use of direct references to the record, as in this case, becomes an accepted practice by the appellate bar, we fear this Court's hard-earned reputation for prompt resolution of the issues before it cannot be maintained.

We would urge those who practice before this Court to include all relevant matters in the extract. We shall be reluctant to delay the resolution of those cases where all relevant information *is contained* in the extract, while we search through voluminous transcripts and records in a case where counsel *has not* included all relevant information in an extract.

We further caution appellate counsel that the amendment's language keeps in place the mandatory requirement of extract inclusion and merely clarifies that we are *not precluded* from considering non-extract matters. We have never been *precluded* from considering the record when we have deemed it necessary. As we perceive the amendment, it was not intended to permit parties to ignore the provisions requiring extract inclusion and reference and substitute wholesale transcript or record references in their briefs.

## The Facts

WMATA was created by Act of Congress as an interstate Compact agency of Virginia, Maryland, and the District of Columbia. Its purpose is to provide and regulate regional transportation services for the District of Columbia and the surrounding Maryland and Virginia metropolitan areas. As relevant to the case *sub judice,* part of its function is to review the planning and design of a new parking garage at the Shady Grove Metrorail Station on WMATA's Red Line in Montgomery County, Maryland. The garage is to be operated by Montgomery County.

WMATA's participation with Montgomery County in the parking facility's construction was governed by a "construction and lease agreement" between it and Montgomery County, as well as by the applicable federal statutes. The agreement provided, in pertinent part:

*Section 1.01.* The County [Montgomery County] shall ... plan, design, construct and operate a parking structure....

. . . .

*Section 4.01.* The County shall prepare, at its sole cost and expense, all design and construction plans and specifications necessary for ... necessary modifications to the WMATA facilities to accommodate the garage, which plans shall be submitted to WMATA for review and approval pursuant to Section 4.02 herein....

*Section 4.02.* WMATA shall have ... the right of review and approval of the following:

(a) functional and aesthetic design of the garage structure ...

(b) Required revisions to existing vehicular access and internal circulation system....

. . . .

*Section 4.06.* During construction the County shall provide alternative interim parking....

*Section 4.07.* Construction of the garage shall include any required modifications or repairs to access roads and the parking lot ... and shall be financed solely by the County....

*Section 5.01.* The County shall be solely responsible for the physical operation of ... the garage.... The garage shall be clearly marked as property of the County.

. . . .

*Section 5.04.* WMATA shall have a permanent right to approve all signs erected by the County....

. . . .

*Section 5.06.* The County will operate the garage facility within parameters established by the WMATA Board in compliance with the WMATA Compact requirements.

Pursuant to the agreement between it and WMATA, the County, through a contract with Dustin, began to construct the garage. During construction, and as a part of the project included within the terms of the agreement, it was necessary that certain access roads be modified to accommodate a ticket dispensing machine. Dustin, for the County, began to construct the island where the machine was to be situated. The island was still under construction at the time of the accident, though no work was in progress when the accident occurred.

Appellants ran over the partially completed island while operating their motor vehicle in dark conditions. This suit for both property damage and personal injury resulted. We shall

address other facts as necessary in our resolution of the issues.

## I.

Appellants, in their complaint below, alleged that under the contract between WMATA and Montgomery County, the County was required to "construct and maintain said parking area." In their negligence averment following factual allegations as to the accident, appellants state only that "the entrance ... was under the control of the Defendants or either of them," that "the Defendants ... had negligently ... redesigned [the entrance,] ... had negligently failed to mark the entrance," and that it "was inherently dangerous...." No other substantive averments of negligence were made.

The expert witness's testimony, as contained in the extract,[2] indicates the following:

> THE WITNESS [MR. SPREIREGEN]: My opinion as to ... this particular place ... was that it was hazardous....

Later an objection to his testimony was made:

> [DEFENSE COUNSEL]: Objection. Move to strike.
>
> [OTHER DEFENSE COUNSEL]: Objection.
>
> [DEFENSE COUNSEL]: ... He has expertise in—he has been offered as an expert to the design—
>
> THE COURT: Objection sustained. Motion to strike granted.
>
> . . . .
>
> THE WITNESS: The alignment of the roadway was hazardous to an approaching driver.
>
> . . . .
>
> ... The alignment of the parking lot entrance, I believe, was such that it constituted a hazard...
>
> A second factor is the signs.

---

**2.** The pagination of Mr. Spreiregen's testimony was in error in the table of contents.

[ANOTHER DEFENSE COUNSEL]: Objection as to anything dealing with signs. He has not been offered as an expert in signs.

. . . .

[THE WITNESS]: ... [T]he alignment ... was hazardous. . . . [T]he signs ... were inadequate.

I would continue with the third point. . . . The striped line was in a poor position. . . .

On the concrete curb, it was not painted yellow. . . . There was no warning rumbling surface. . . . The painted line ... should have flared to the width of the concrete curb. . . .

All of these ... constitute ... a real hazard. . . .

. . . .

... It should have flared. It should have divided out.

That concludes the portion of the expert's testimony contained in the extract. We have carefully read the testimony of the plaintiff's other witnesses contained in the extract. We note first that the parties' extracted testimony is exceedingly sparse. Appellants testified:

[B]efore I knew what it was, there was this island right in front of me. I struck it. . . .

. . . .

... [T]here were no lights, no light poles of any type. . . .

He stated that the nearest light was approximately 100 feet away, and that there were no traffic signs or warnings.

Mrs. Noble testified, "I do not remember seeing any signs, nothing that warned me."

Appellee argues in its brief that appellants had tacitly acknowledged in their motion argument before the trial court that the only evidence provided related to the design, not operation and maintenance, of the divider. Our review results in that same conclusion. We note that appellants' expert was qualified to testify about "[t]he design of parking lots and entrance and egress." The only evidence reproduced in the extract relates to design and poor planning. Our separate

consideration of the transcripts also confirms that the evidence presented below primarily related to design and planning defects. We shall thus for the most part concentrate our consideration on the issue of whether WMATA has immunity in respect to the planning and design functions.

### The Law

WMATA was created by the legislative bodies of Maryland, the District of Columbia, and Virginia, as well as by Congress. Maryland created and approved the Compact by Chapter 869 of the laws of 1965, first codified as Article 41, section 317–1 *et seq.* of the Annotated Code, 1957 edition, 1965 Cumulative Supplement. The legislation, as amended from time to time, is now contained in Maryland Code (1977, 1993 Repl.Vol.) section 10–201 *et seq.* of the Transportation Article. As far as we have discovered, there are no prior Maryland cases discussing the character of WMATA as a state or federal entity or the respective immunities it may enjoy in Maryland courts.[3] The cases discussing these issues are federal cases applying the federal governmental/proprietary distinction.

■ The purpose of the Compact as adopted by Maryland statute was to "create a regional instrumentality, *as a common agency of each signatory party. . . .*" *Id.,* section 10–204, 2 (emphasis added). Thus, to the extent it can be argued that WMATA is not an instrumentality of the United States, it would, of necessity, be an agency of the respective states, and not an agency of any local government. WMATA is expressly authorized to contract for and lease any of its facilities for operation by others. Section 80 of Article XVI "General Provisions" (Trans. Art. 10–204, 80) provides:

> The Authority shall be liable for its contracts and for its torts . . . committed in the conduct of any proprietary

---

3. The Court of Appeals has, however, noted in *Washington Metro. Area Transit Auth. v. Queen,* 324 Md. 326, 330, 597 A.2d 423 (1991), that the United States Court of Appeals for the District of Columbia in *Queen v. Washington Metro. Area Transit Auth.,* 901 F.2d 135, 138 (D.C.Cir. 1990), held that " '[t]he Authority shall be liable for its contracts . . . *in accordance with the law of the applicable signatory. . . .*' "

function, *in accordance with the law of the applicable signatory*[4] ... but shall not be liable for any torts occurring in the performance of a governmental function. The exclusive remedy ... shall be by suit against the Authority. *Nothing contained in this title shall be construed as a waiver by ... Maryland ... of any immunity from suit.* [Emphasis added.]

■ Thus, as a result of this statute, WMATA, if a Maryland State agency, has specified immunity under the Compact as to torts arising out of a governmental function. Additionally, when sued in the courts of Maryland, it may have a pre-existing general immunity that is expressly preserved by the specific provisions of the Compact. Thus, unless its general immunity was waived independent of this Compact, WMATA, if a State agency, would have general immunity in Maryland courts in respect to its actions. Even if it had waived State law immunity, it would still have immunity for governmental functions by reason of the explicit statement in this statute, as approved by Congress. While WMATA, as a Maryland agency, may have a greater immunity from suit in Maryland courts than that granted by subsection 80, it can have no less in any court.

We have long recognized that the doctrine of sovereign or governmental immunity generally protects the State of Maryland from suit unless ... waived by the General Assembly.[5]

State agencies have normally been treated as if they were the State ... for purposes of immunity....

*Board of Education v. Mayor of Riverdale*, 320 Md. 384, 388–89, 578 A.2d 207 (1990) (citation omitted). The State's immunity is not dependent upon the characterization of its conduct

---

4. *See Washington Metro. Area Transit Auth. v. Queen*, 324 Md. 326, 597 A.2d 423, citing *Queen v. Washington Metro. Area Transit Auth.*, 901 F.2d 135.

5. No issues relative to the State Tort Claims Act are raised here. In any event, the record reviewed fails to reveal any satisfaction of the State Act's notice requirements.

as governmental or proprietary—it is absolute *unless waived.* "Neither this Court nor the General Assembly ... has ever utilized the governmental-proprietary distinction with respect to the tort immunity of a state agency." *Maryland–Nat'l Capital Park and Planning Comm'n v. Kranz,* 308 Md. 618, 626, 521 A.2d 729 (1987) (holding immunity waived under specified statute). See also *Rucker v. Harford County,* 316 Md. 275, 297, 558 A.2d 399 (1989); *Katz v. Washington Suburban Sanitary Comm'n,* 284 Md. 503, 509, 397 A.2d 1027 (1979) (commission a state agency for immunity purposes); *O & B Inc. v. Maryland–Nat'l Capital Park and Planning Comm'n,* 279 Md. 459, 465–66, 369 A.2d 553 (1977) (commission a state agency).

In *Katz,* it was contended that the commission was a local entity and thus had no immunity for its proprietary actions. The commission argued that it was "a 'sister agency' to the ... Park and Planning Commission, and that the reasons for our [the Court of Appeals] holding in *O & B,* 279 Md. 459, 369 A.2d 553, that the Commission is a State agency, which had not waived its immunity from suit appl[ied]...." *Katz,* 284 Md. at 507, 397 A.2d 1027. The Court noted:

> The doctrine of sovereign immunity from suit, rooted in the ancient common law, is firmly embedded in the law of Maryland. Although originally based on the tenet that "the King can do no wrong," the doctrine is presently viewed as a rule of policy which protects the State from burdensome interference with its governmental functions and preserves its control over State agencies and funds.

> In Maryland the doctrine ... is applicable not only to the State itself, but also to its agencies and instrumentalities unless ... waived....

> ....

> We think the lower courts correctly decided that WSSC is a State agency. Created by the legislature through a public general law, the WSSC is vested with broad authority ... within the ... District, which comprises most of the counties of Prince George's and Montgomery.... It is [also]

authorized to construct and operate ... systems in and for the residents of Anne Arundel and Howard Counties....

. . . .

Despite a degree of regional control, the WSSC ... was created by the State and not by the counties in which it operates.... [It] has regional functions and responsibilities ... [it was] created by the General Assembly as [a] State agenc[y] ... for providing services which would otherwise be the responsibility of the counties.

*Id.* at 507–12, 397 A.2d 1027 (citations and footnotes omitted). As we have noted, WMATA was created by the states, the District of Columbia, and the federal government, not by the local governments wherein it operates. It is not, therefore, a local agency but a state/federal entity.

■ As we have earlier indicated, the relevant portions of the agreement between WMATA and Montgomery County limited WMATA's function as of the time of the accident to review and approval of design and plans for the parking garage and necessary access improvements. The evidence indicates only that the accident may have resulted from negligent design and planning.

To the extent it can be argued that we should consider WMATA as a federal agency and apply federal law, the end result would be the same. WMATA, under the Compact, has immunity for its governmental actions. WMATA's acts here complained of are governmental in nature. Thus, whether federal law or Maryland law is applied, in the context of this case WMATA's immunity remains the same.

WMATA's only participation as of the time of the accident was in the review and approval of plans, a quintessential part of the planning and design process. Furthermore, under the agreement, it was not to operate or maintain the ticket dispensing island. *Sanders v. Washington Metro. Area Transit Auth.*, 819 F.2d 1151 (D.C.Cir.1987), involved a challenge to WMATA's employee/accident drug testing policy. The Court discussed the creation of WMATA:

[I]t is especially appropriate to follow the Congressional understanding, in tort cases, of "governmental function." First, "Congress played a particularly active role in creating WMATA," initiated the Compact, and "expressly retain[ed] WMATA's immunity from suit for 'torts occurring in the performance of a governmental function.'" *Morris v. WMATA, supra*, 781 F.2d at 222. Second, *Tort suits involving a "governmental function" are quite dissimilar under Section 80 from suits (including tort claims) involving a "proprietary function" in that the latter (but not the former) are controlled by "the law of the applicable signatory"...*

*Id.* at 1155 (emphasis added, footnote omitted).

In *Morris v. Washington Metro. Area Transit Auth.*, 781 F.2d 218, 219–20 (D.C.Cir.1986), the Court identified a source of WMATA's immunity:

WMATA's sovereign immunity exists because the signatories have successfully conferred their respective sovereign immunities upon it. Congress has power to legislate for the District of Columbia and to create an instrumentality that is immune from suit. Maryland and Virginia have immunity under the eleventh amendment [in federal courts] and each can confer that immunity upon instrumentalities of the state. It is clear that each of the three signatories attempted to confer its sovereign immunity upon WMATA. We think they succeeded....

In *Beatty v. Washington Metro. Area Transit Auth.*, 860 F.2d 1117, 1126 (D.C.Cir.1988), the Court noted: "It is not questioned that '[a]s a quasi-governmental entity created by its signatory parties, WMATA is entitled to share the sovereign immunity of those parties with respect to common law tort actions.'" It then stated: "The cases teach that WMATA will not be liable for determinations made in establishing 'plans, specifications or schedules of operations' for the Metrorail." *Id.* at 1127. *See also Royal Caribbean Corp. v. Puerto Rico Ports Auth.*, 973 F.2d 8, 10–11 (1st Cir.1992); *Simpson v. Washington Metro. Area Transit Auth.*, 688 F.Supp. 765, 766–

67 (D.D.C.1988) (design decision on the distance between platform edges and trains a discretionary-governmental function); *Dant v. District of Columbia,* 829 F.2d 69, 71, 75 (D.C.Cir.1987) (no action for *"negligent or faulty design"*); *Nathan v. Washington Metro. Area Transit Auth.,* 653 F.Supp. 247 (D.D.C.1986) (slip and fall case where the court held that a planning decision regarding the design and construction for a stairwell at a station was a governmental function). *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *Baum v. United States,* 986 F.2d 716, 718 (4th Cir.1993) (design and construction of a guard rail); *Clark v. United States,* 805 F.Supp. 84, 86–87 (D.N.H.1992); *Schmitz v. United States,* 796 F.Supp. 263, 265–66 (W.D.Mich.1992); *Fridge Const. Co. v. Federal Emergency Management Agency,* 797 F.Supp. 1321, 1342–43 (S.D.Miss.1991); *Blakey v. USS Iowa,* 780 F.Supp. 350 (E.D.Va.1991); *Heffner v. Montgomery County,* 76 Md.App. 328, 336, 545 A.2d 67 (1988); *Heiden v. Milwaukee,* 226 Wis. 92, 275 N.W. 922 (1937).

Appellants, in their sparse argument on the immunity issue, do not specifically address the Maryland law, relying instead on other generalized statements primarily applicable to federal and local governments where the governmental/proprietary distinction has relevance. They appear to base their argument on the theory that the "Manual on Traffic Control Devices" (MUTCD) somehow is transformed into a regulation or statute limiting the discretionary aspect of WMATA's planning and design review role in respect to the traffic island at issue. We perceive from the record that the MUTCD was never admitted into evidence. It was not even proffered as support for the arguments made here. Additionally, there was no evidence offered below that it had been adopted as a mandatory standard for Maryland. Appellants argue here that the MUTCD has been adopted by referring to Transportation Article § 25–104, which merely says that the administrator shall adopt a manual for highways in the state that "shall correlate with and ... conform so far as possible to the

system" in the MUTCD. We have no way of knowing if the MUTCD was adopted "so far as possible" and, if adopted, which parts it was not possible to adopt. Likewise, whether the manual has been adopted, it is not in evidence and, therefore, we could not determine whether this parking garage entrance would qualify as a highway subject to its provisions. Whatever any actual or future manual may or may not say, it cannot change the review and planning function of WMATA from a governmental to a proprietary function and in Maryland it makes no difference in any event. As we have said, the evidence only supports WMATA's involvement in planning and design. We have found selected portions of the MUTCD which had been marked for identification in the record. There is nothing in those portions that, even if admitted in evidence, would indicate any intention to waive any extant sovereign immunity, whether state or federal.

We thus conclude that whether WMATA is a state or a federal agency, or both, it has immunity from suit for any governmental function it performs. As to proprietary functions, it has the even broader immunity a Maryland agency enjoys when suit is brought in Maryland courts.

### The Expert Testimony

The only expert testimony offered related to design and planning—an area where WMATA, whether under federal or state law, has immunity. As we perceive it, there was no expert evidence offered in respect to the traffic safety aspects of the garage's operation and maintenance sufficient to have allowed the case against WMATA to go to the jury. This is true even if WMATA had a role in the construction and operation of the garage and access ways and had responsibility for the operation and maintenance, which it does not under its agreement and the Compact. In *Washington Metro. Area Transit Auth. v. Davis,* 606 A.2d 165 (D.C.App.1992), WMATA contended that Davis's failure to present expert testimony regarding the proximate cause of the accident resulted in there being insufficient causation evidence. The court agreed. "Expert testimony is required . . . when the subject matter

... is 'so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman.'" *Id.* at 170.

At one point during the expert testimony in the instant case the following exchange occurred. One of plaintiffs' attorneys below, in reference to the relevance of photographs taken years after the accident, said:

[PLAINTIFF'S COUNSEL]: History, Your Honor. Right there you see—this is the history of the island, where this shows prior construction.

[OTHER PLAINTIFF'S COUNSEL]: It is a little more important.... His opinion is two-pronged. It goes to the condition at the time of the accident....

. . . .

[OTHER PLAINTIFF'S COUNSEL]: Then the secondary prong of his testimony as an expert is that the whole thing is defective in its design. Now that gets WMATA out of it.

THE COURT: In 1988 it was defective in its design?

[OTHER PLAINTIFF'S COUNSEL]: Yes. It was defective from the beginning and is still today.

. . . .

... There is testimony going to design, which may get WMATA out of it. It does not get the others—

The plaintiff's expert testified that he had a degree in architecture; that his "whole career has been spent as an architecture [sic] and planner." He submitted his resume which described his past architectural and planning projects. He was offered as an expert in architecture and design of parking lots and exit and entrance roadways.

Prior to this trial, the expert had only testified twice in court as an expert witness and then only as an expert in city planning, both several years before the present incident. When asked whether he had ever testified as an expert in the field of safety and traffic engineering he answered: "I don't have a recollection of doing that, no." He admitted that he

was not a traffic engineer and that he never testified in court as an expert in that field.  The court ultimately ruled:

> [H]e has designed parking lots ... and has designed roads leading in and leading out.
>
> But there is nothing in his background that makes him an expert in safety or traffic signage or anything else....
>
> . . . .
>
> ... [H]e can say whether the design was bad or good ... whether it was a safe or unsafe design, but not how many signs there ought to be, how far apart lights ought to be, or anything like that.
>
> . . . .
>
> ... I am going to receive [him] ... as an expert ... as to his opinion of the design and layout of this area of the parking lot.
>
> . . . .
>
> [DEFENSE COUNSEL]: What field of expertise is it that this gentleman is going to be qualified to testify about?
>
> THE COURT: The design of parking lots and entrance and egress.

Later, the court reiterated the limitations on the expert testimony.  It is clear to us that this expert testimony was limited to design and planning.

### Conclusion

The record of the trial below indicates that during trial appellants' case became primarily focused on Montgomery County.  Appellants all but conceded that WMATA's role in reviewing plans and designs did not subject it to liability.  Appellants offered little or no evidence of any other role played by WMATA.  The portions of the traffic manual offered but not accepted in evidence do not contain any information that could even conceivably be construed as waiving general or specific governmental immunity.  Additionally, there was no evidence of the adoption of any manual; if some manual was adopted, it is not in evidence.

Appellants' primary focus apparently switched back to WMATA when the jury returned a defendant's verdict for Montgomery County. When the focus switched back to WMATA, appellants were left with the case it had essentially presented against the County—a case that was even less sufficient against WMATA.

WMATA, as a state entity has absolute immunity unless immunity is waived; under section 80 of the Compact and the federal standards discussed *supra*, it would have governmental immunity in federal court. It thus has specific and general immunity in this State's courts unless waived. It was not waived here. Under any standard, WMATA's defense of sovereign immunity was appropriate.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.