961 A.2d 591

## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

v.

## Ruby DESCHAMPS.

**No. 1707, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Dec. 3, 2008.

280

282

Gerard J. Stief (Michael K. Guss, Carol B. O'Keeffe, General Counsel on the brief), Washington, DC, for Appellant.

Thomas A. McManus, Upper Marlboro, for Appellee.

Panel: DAVIS, MATRICCIANI and ROBERT L. KARWACKI (Retired, specially assigned), JJ.

MATRICCIANI, Judge.

This case comes to us from a jury verdict in the Circuit Court for Prince George's County, holding appellant/cross-appellee Washington Metropolitan Area Transit Authority ("WMATA") liable to appellee/cross-appellant Ruby Deschamps ("Ms. Deschamps") for negligence stemming from injuries she sustained while riding a WMATA-operated escalator. WMATA made motions for judgment both at the conclusion of Ms. Deschamps' case and at the conclusion of all the evidence, which the court denied. After the conclusion of a three-day trial, the jury awarded Ms. Deschamps $51,781.95 for past medical expenses and $300,000 for non-economic damages. WMATA thereafter filed a motion for judgment notwithstanding the verdict, or alternatively, a new trial, remittitur, or a conformation of the judgment to the statutory cap. The court granted WMATA's motion to reduce the verdict, but denied the motion otherwise.

WMATA timely appealed and presents four issues for our review, which we have reordered as follows:

I. Whether the trial court erred in applying Maryland substantive tort law rather than the law of the District of Columbia.

II. Whether the trial court erred in refusing to give the notice instruction requested by WMATA.

III. Whether the trial court erred in denying WMATA's motions for judgment where Ms. Deschamps failed to produce legally sufficient evidence that WMATA either caused or had notice of the alleged defect which caused her injuries.

IV. Whether the trial court erred in denying WMATA's motions for judgment where Ms. Deschamps failed to present expert testimony regarding escalator operations or maintenance.

Ms. Deschamps cross-appealed and presents one issue for our review, which we have reworded slightly: Whether the trial court erred in reducing the jury verdict pursuant to the Maryland Tort Claims Act.

For the reasons we explain below, we affirm the judgments.

## FACTS AND PROCEEDINGS

On January 14, 2003, at approximately 8:15 a.m., Ms. Deschamps was traveling to her workplace on Metrorail, owned and operated by WMATA. She boarded Metrorail's Orange Line at the New Carrollton station, and exited the train at the Metro Center station in order to transfer to the Red Line. In order to board a Red Line train, passengers transferring from the Orange Line must ascend one level within the station. Ms. Deschamps boarded an escalator and placed her right hand on the guard rail. Shortly after she began ascending on the escalator, the right sleeve of her winter coat became ensnared between the bottom of the guard rail and the top of the plexiglass paneling below. Ms. Deschamps remained ensnared for several seconds until a fellow passenger helped pull Ms. Deschamps free.

On January 11, 2006, Ms. Deschamps filed a complaint and demand for a jury trial in the Circuit Court for Prince George's County. In her complaint, Ms. Deschamps alleged that WMATA owed her a duty to exercise reasonable and ordinary care to inspect and maintain the premises safely; WMATA breached that duty by not properly maintaining the escalator; and a direct result of that breach caused Ms. Deschamps physical injuries and emotional trauma. On March 27, 2006, WMATA filed an answer denying liability.

On May 2, 2007, a jury trial was held. Ms. Deschamps, as plaintiff below, first called Dr. Bruce Ammerman, chief of neurosurgery at Sibley Hospital in Washington, D.C., as an expert witness in the field of neurosurgery. Dr. Ammerman testified that he first saw Ms. Deschamps in March 1999 regarding pain she was experiencing from a car accident despite having undergone a cervical fusion operation by another doctor a year prior. He further testified that in November 2000 he performed an operation on Ms. Deschamps to relieve a pinched nerve, and as a result, she began to feel better and was therefore discharged in January 2001.

Dr. Ammerman testified that he did not treat Ms. Deschamps again until January 21, 2003, when she came to his office complaining of pain she began experiencing after the January 14, 2003 incident. He testified that, despite medication and physical therapy, Ms. Deschamps was not getting better. Consequently, he performed a CAT scan in December 2005 which revealed that Ms. Deschamps had a pinched nerve and herniated disk on her right side. On February 28 and March 16, 2006, Dr. Ammerman again operated on Ms. Deschamps, and her symptoms thereafter improved. Dr. Ammerman concluded that, in his expert opinion and to a reasonable degree of certainty, (1) the injuries Ms. Deschamps suffered on January 14, 2003, although mitigated, are permanent in nature, and (2) the medical expenses incurred by Ms. Deschamps, including those related to the two operations he performed, were causally related to the January 14, 2003 incident.

Ms. Deschamps also called her adult daughter, Tracy Harrison, and son, Wendell Francis, to testify. Ms. Harrison testified that, prior to the January 14, 2003 incident, Ms. Deschamps was heavily involved with Ms. Harrison's three children, but after the incident she stopped babysitting and became less involved because she was not physically able to care for her grandchildren. Ms. Harrison also testified that after the incident she began having to do a variety of routine tasks for Ms. Deschamps. Mr. Francis similarly testified that his mother had almost fully recovered before the incident, but her condition "went downhill" after the incident.

Ms. Deschamps testified that on the day of the incident, she placed her hand on the guard rail and soon thereafter her coat sleeve became caught between the guard rail and the plexiglass paneling beneath the guard rail. She testified that she "was jerked backward onto the escalator, and my arm [remained stuck], and the escalator was continuing up." She also testified that the plexiglass section "was pulled out" once she had been freed by a fellow passenger, and she had not noticed that condition when she first boarded the escalator. She testified that, while still at the station, she felt numbness in her neck and a tingling sensation, and reported her condition to Metro employees. Ms. Deschamps testified that she continued to experience significant pain in her neck and shoulder throughout 2004 and 2005, and the pain associated with the treatment she received—most particularly the CAT scan, in which a long needle was used to inject dye into her neck—was similarly traumatic. She testified that, because of her injuries from the incident, she lost a romantic relationship with a man, was not able to be involved with her grandchildren, travel to see family, or be involved in her church. On cross-examination, Ms. Deschamps admitted to prior physical ailments, including those similar to the ones she experienced following the incident, but on redirect she maintained that she was only seeking compensation for injuries created anew or aggravated as a result of the incident.

Counsel for Ms. Deschamps also read from the depositions of Michelle Jones, corporate designee for WMATA, and Cedric

Watson, superintendent of the office of escalators for WMA-TA. Ms. Jones, referring to a report she created the morning of the incident, testified that (1) she observed that the plexiglass was not attached to the guard rail or the frame of the escalator; (2) the condition was unsafe; (3) her inspection of the escalator that morning did not reveal the defective condition; and (4) WMATA had an obligation to ensure the premises are safe for patrons. Mr. Watson testified that, in reviewing the documentation of the incident, the balustrade—or the area of the escalator above the steps on either side of the step bed—was not secure. He also testified that a section of plexiglass on the same escalator was found to not be properly in its trap a week prior to the incident involving Ms. Deschamps. Mr. Watson also testified that it was not unusual for gaps in the plexiglass to appear or for entire panels to pop out, especially in areas with a high volume of usage such as Metro Center station.

After reading portions of Mr. Watson's deposition, Ms. Deschamps rested her case. WMATA thereafter made a motion for judgment, arguing that Ms. Deschamps had (1) failed to prove her case; (2) failed to prove that WMATA had notice of the alleged defect; (3) failed to produce expert testimony regarding WMATA's alleged negligent maintenance of the escalator; and (4) failed to prove how long the allegedly defective condition existed. The court denied WMATA's motion "at th[at] time, in the light most favorable to [Ms. Deschamps]."

WMATA thereafter presented its case. WMATA first called Michelle Johnson–Jones, the station manager responsible for the area containing the escalator at issue at Metro Center station on January 14, 2003. Ms. Johnson–Jones testified that she inspected the escalator at issue that morning prior to opening the station to the public, and found no defects. She also testified that, after Ms. Deschamps approached her to tell her she tore her coat on the escalator, she accompanied Ms. Deschamps back to the escalator, where she saw a plexiglass panel protruding from its frame. Ms. Johnson–Jones testified that customers can damage the escalator

in a number of ways, but she had received no reports of any damage between the time she inspected the escalator and the time she was approached by Ms. Deschamps. She also testified that, in her written report of the incident, she noted that Ms. Deschamps complained of "injuries to right wrist, back and neck, in pain," but she did not see any "visible injuries sustained."

WMATA next called Phillip Harris, a WMATA escalator technician. Mr. Harris testified that he performed a scheduled inspection of the escalator at issue on January 9, 2003, and did not observe any problems with the balustrade.

WMATA also called Cedric Watson, whose deposition Ms. Deschamps read during her case-in-chief. Mr. Watson testified that it is possible for one's clothing to become snagged between the one-eighth-of-an-inch space between the guard rail and the panels below, even absent any malfunction or problem with the balustrade. On cross-examination, Mr. Watson acknowledged several listings in a repair log for the escalator at issue, including an October 11, 2002 entry indicating "side panels stick out, unit blocked[,] side panel sticking out, action taken, resecured decking, left side"; an October 5, 2002 entry stating "found bottom right side decking bent, remove, unable to replace with new, need new decking clips update"; an October 27, 2002 entry stating "resecured bottom right deck"; and a November 20, 2002 entry stating "reinstalled bottom right curve decking." Mr. Watson testified that, in discussing the balustrade glass and decking, he wanted "to make it very clear that we're talking about two different components," but also conceded that "[t]here is a direct relation [between the decking and] the stability [of the balustrade glass], but there is not a direct relation to the fact of how the glass itself moves. The glass is assembled in a tracking system."

At the close of WMATA's case, counsel for Ms. Deschamps called Ms. Deschamps as a rebuttal witness. Ms. Deschamps testified that she saw a doctor in November 2006 at the request of WMATA, but that the visit only lasted ten to fifteen

minutes because that doctor did not have any of Ms. Deschamps' medical records to compare to his examination that day.

WMATA thereafter renewed its motion for judgment on the same grounds it articulated at the close of Ms. Deschamps' case-in-chief. WMATA added that the jury had heard testimony from Mr. Watson that clothing can become snagged on WMATA escalators absent any defect or negligent condition. The court denied WMATA's motion, stating "[the][c]ourt finds there's a genuine dispute that presents a jury issue, and for that reason, I deny the motion."

Prior to the court's instructing the jury, WMATA objected to the court's intention to instruct the jury on the heightened-standard-of-care owed by escalator owners and/or operators, arguing instead that the standard should either be the reasonable care standard under Maryland premises liability law, or the reasonable care standard under District of Columbia law—both of which require notice of the alleged defect. The court ruled that WMATA failed to timely put the court on notice that District of Columbia law was distinguishable from that of Maryland, and thus the court presumed them to be the same. The court added that to acknowledge a different level of proof required of Ms. Deschamps after all the evidence had been presented was highly prejudicial to her, and therefore ruled that Maryland law—and in particular, the heightened standard of care under Maryland elevator liability law—would apply.

The jury awarded Ms. Deschamps $51,781.95 for past medical expenses and $300,000 for non-economic damages. On May 14, 2007, WMATA filed a motion for judgment notwithstanding the verdict, or alternatively, a new trial, remittitur, or a conformation of the judgment to the statutory cap. On August 17, 2007, the court heard argument on the motion, and on August 30, the court granted WMATA's motion to reduce the verdict but denied the motion otherwise.

WMATA timely appealed. Ms. Deschamps timely cross-appealed. We shall include additional facts as they become pertinent to our discussion.

## DISCUSSION

### I.

WMATA argues that the trial court erred in applying Maryland substantive tort law rather than the substantive tort law of the District of Columbia. In support of its argument, WMATA notes that Maryland adheres to the principle of *lex loci delictus* in determining which jurisdiction's tort law applies, and argues that, because Ms. Deschamps' injuries occurred in the District of Columbia, that jurisdiction's substantive law should have been applied notwithstanding WMATA's failure to give timely notice of its intent to rely upon foreign law. In essence, WMATA argues that the trial court abused its discretion in refusing to apply District of Columbia substantive tort law to the case at bar. We disagree.

A trial court abuses its discretion "where no reasonable person would take the view adopted by the trial court[,] or when the court acts without reference to any guiding rules or principles." *Wilson v. John Crane, Inc.*, 385 Md. 185, 198, 867 A.2d 1077 (2005) (citation and internal quotation marks omitted). In other words, "an abuse of discretion should only be found in the extraordinary, exceptional, or most egregious case." *Id.* at 199, 867 A.2d 1077.

"Maryland adheres to the *lex loci delicti* rule in analyzing choice of law problems with respect to causes of action sounding in tort." *Philip Morris, Inc. v. Angeletti*, 358 Md. 689, 744, 752 A.2d 200 (2000). That rule provides that, "when an accident occurs in another state[, the] substantive rights of the parties, even though they are domiciled in Maryland, are to be determined by the law of the state in which the alleged tort took place." *Id.* at 745, 752 A.2d 200 (citation omitted). That rule notwithstanding, Md.Code (1973, 2006 Repl.Vol.), § 10–504 of the Courts and Judicial Proceedings Article

("CJP") provides that, in order for "a party to offer evidence of the law in another jurisdiction or to ask that judicial notice be taken of it, reasonable notice shall be given to the adverse parties either in the pleadings or by other written notice."

In *Chambco v. Urban Masonry Corp.*, 338 Md. 417, 659 A.2d 297 (1995), the Court of Appeals synthesized this area of law, stating that,

> [w]here the parties to an action fail to give the statutory notice of an intent to rely on foreign law, and where it is clear that one or more issues in the case are controlled by another jurisdiction's law, a court in its discretion may exercise one of two choices with respect to ascertaining the foreign law. First, the court may presume that the law of the other jurisdiction is the same as Maryland law. Alternatively, the court may take judicial notice of the other state's law. This discretion may be exercised by either the trial court, or by an appellate court on direct appeal, or by [the Court of Appeals] after issuing a writ of certiorari.

*Id.* at 421, 659 A.2d 297 (footnote and internal citation omitted).

In the case at bar, WMATA requested for the first time that the court apply District of Columbia law on the morning of jury instruction. Citing *Chambco,* WMATA reminded the court that, in its discretion, it could either presume that District of Columbia law was the same as Maryland law, or take judicial notice of District of Columbia law, and requested that the court do the latter. The court denied WMATA's request, stating:

> It's my choice to presume that the law is the same, since [WMATA] did not put the court on notice of any distinguish [sic]. That's the decision .... [because Ms. Deschamps], who has the burden of proof, without notice of the distinction in the District of Columbia law, has proceeded to present [her] evidence under the assumption that the standard to be applied would be that of Maryland law.... Since that different standard would have created a different level of proof required of [Ms. Deschamps], it is highly prejudicial

to [her] to be told on the eve of jury argument that some other standard must be applied that would have required additional evidence. It's too late for that. And for that reason, [WMATA's] motion to apply a different standard is denied.

WMATA now seeks to excuse its delay by arguing that both parties were fully aware from the outset that Ms. Deschamps' alleged injuries occurred in the District of Columbia, and moreover, Ms. Deschamps's original complaint contained language suggesting she was proceeding under a premises liability reasonable standard of care in accord with District of Columbia law. Consequently, WMATA argues, Ms. Deschamps could not have been surprised or prejudiced by an eleventh hour application of District of Columbia law.

■■ WMATA further argues that this Court's opinion in the case of *Johns Hopkins Hosp. v. Correia,* 174 Md.App. 359, 383, 921 A.2d 837 (2007), *aff'd,* 405 Md. 509, 954 A.2d 1073 (2008) (reaffirming that owners and/or operators of elevators in Maryland owe passengers the duty to exercise the highest degree of skill and care in operation and maintenance), filed April 30, 2007, "brought the issue regarding the standard of care for an elevator/escalator operator to the forefront only two days before the trial in this case." Moreover, WMATA argues that escalator owners should not be held to the same heightened standard of care as elevator owners because escalators are more easily damaged by its users. WMATA argues that those unique circumstances warrant either our conclusion that the trial court abused its discretion in denying WMATA's request to apply District of Columbia law, or alternatively, the exercise our own discretion in its favor under *Chambco.* We decline to take either course of action.

Although Ms. Deschamps' original complaint suggests a premises liability cause of action, her counsel's actions throughout trial suggest an assumption that a heightened common carrier standard would be applied. Furthermore, the case was being tried in Maryland, and, under CJP § 10–504, it was WMATA's obligation to provide reasonable notice to Ms.

Deschamps of its intent to rely upon District of Columbia law. We conclude that the trial court did not abuse its discretion in finding that notice given after both parties had presented their cases, and minutes before jury instruction, did not constitute reasonable notice. We therefore affirm the trial court's rejection of WMATA's request. In so concluding, we decline to distinguish escalator liability from elevator liability. *See Correia*, 405 Md. at 522, 954 A.2d 1073 (noting that "the majority rule in this country is that is that owners of elevators or escalators owe a heightened standard of care to their passengers," and citing *Correia*, 174 Md.App. at 365–73, 921 A.2d 837, for recent decisions in other jurisdictions); *Correia*, 174 Md.App. at 370, 921 A.2d 837 (noting that, "[a]lthough no Maryland appellate court has yet decided the issue, most (but not all) courts in this country impose the same duty upon the owners/operators of escalators as that imposed upon those who own or operate elevators"); *id.* at 378, 921 A.2d 837 (citing seminal cases *Belvedere Bldg. Co. v. Bryan*, 103 Md. 514, 535, 64 A. 44 (1906) (stating that elevator owners are required to "use the greatest care" in providing "safe and suitable cars, appliances, and machinery") (citation omitted)), and *Owners' Realty Co. v. Richardson*, 158 Md. 367, 371, 148 A. 543 (1930) (holding owner to the highest standard of care not only in operation of its elevator but also "in providing safe and suitable equipment").

## II.

■ WMATA argues that the trial court erred in refusing to give the notice instruction it requested. That request, however, became moot once the trial court ruled that it would apply Maryland's heightened common carrier standard of care instead of either the District of Columbia reasonable care standard or the Maryland premises liability standard—both of which require the owner to have had notice of the allegedly defective condition. *See WMATA v. Johnson*, 726 A.2d 172, 176 (D.C.1999); *Joseph v. Bozzuto Mgmt. Co.*, 173 Md.App. 305, 315, 918 A.2d 1230 (2007).

Nevertheless, WMATA argues that Ms. Deschamps was not relieved of her burden to prove that WMATA had notice of the alleged defect even under common carrier liability. We disagree. WMATA cites *Carolina Coach Co. v. Bradley*, 17 Md.App. 51, 299 A.2d 474 (1973), and *Lusby v. Baltimore Transit Co.*, 195 Md. 118, 72 A.2d 754 (1950), in support of its argument that notice was required in this case. Those cases are distinguishable, however, in that they concern the existence of foreign substances or debris on buses or bus companies' other property, placed there by employees or passengers. The issue in the case at bar is not whether a foreign substance caused Ms. Deschamps' injuries, but whether the escalator itself was negligently maintained such that it caused her injuries. The jury found that WMATA was negligent under the facts of this case, in light of sufficient evidence to establish notice as a matter of law. Hence, the trial court's failure to instruct the jury on notice amounted, at best, to harmless error.

## III.

WMATA argues that the trial court erred in denying its motions for judgment because Ms. Deschamps failed to produce legally sufficient evidence that WMATA either caused or had notice of the alleged defect which caused her injuries.[1] We need not linger long here. When deciding a motion for judgment, the trial court "must consider the evidence, including the inferences reasonably and logically drawn therefrom, in the light most favorable to the party against whom the motion is made. If there is any evidence, no matter how slight, legally sufficient to generate a jury question, the motion must be denied[.]" *Barrett v. Nwaba*, 165 Md.App. 281, 289, 885 A.2d 392 (2005) (citations omitted and emphasis removed).

---

1. We reiterate that WMATA, as a common carrier held to a duty to exercise the highest degree of skill and care in operation and maintenance of its escalators, was not required to have had notice of the alleged defective condition.

 In the case at bar, although WMATA offered evidence that a passenger's clothing could be caught like Ms. Deschamps' without any negligence on the part of WMATA, Ms. Deschamps offered evidence that it was not unusual for gaps in the plexiglass to appear or for entire panels to pop out, and the escalator on which Ms. Deschamps' coat was snagged had been repaired for plexiglass and decking problems within approximately three months of the January 14, 2003 incident. That evidence was sufficient to generate a jury question, and the trial court therefore did not err in denying WMATA's motion for judgment.

## IV.

WMATA argues that the trial court erred in denying its motions for judgment where Ms. Deschamps failed to present expert testimony regarding escalator operations or maintenance. WMATA argues that expert testimony is required in cases involving complex machinery as to whether the alleged malfunction or defect would not occur absent negligence. Ms. Deschamps acknowledges that rule, but argues that the machinery at issue was not so complex as to require expert testimony. We agree with Ms. Deschamps.

As a question of law, we review this issue *de novo.* *Lowery v. Smithsburg Emergency Med. Serv.,* 173 Md.App. 662, 682–83, 920 A.2d 546 (2007). Maryland Rule 5–702 provides, in relevant part, that "[e]xpert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact at issue. In making that determination, the court shall determine ... the appropriateness of the expert testimony on the particular subject[.]" WMATA points our attention to *Holzhauer v. Saks & Co.,* 346 Md. 328, 697 A.2d 89 (1997), in which the Court of Appeals, on certification from the United States District Court for the District of Maryland, considered whether the doctrine of *res ipsa loquitur* applies in cases involving the malfunction of complex machinery where no expert testimony is produced that the malfunction would not have occurred absent negli-

gence. The Court answered that question in the negative, holding that expert testimony is indeed required in such cases. *Id.* at 341, 697 A.2d 89.

 Aside from the fact that the case at bar is not a *res ipsa loquitur* case, the dislodging of a plexiglass panel from its tracking is not so complex so as to require expert testimony regarding how the panel might have become loose absent WMATA's negligence. *See id.* at 341, 697 A.2d 89 (explaining that "whether an escalator is likely to stop abruptly in the absence of someone's negligence is a question that laymen cannot answer based on common knowledge[; rather,] it requires knowledge of 'complicated matters' such as mechanics, electricity, circuits, engineering, and metallurgy"). To the contrary, we conclude that the nature of the alleged defect at issue was within the common knowledge of the jurors because it did not require knowledge of technical or complicated matters. *See Meda v. Brown*, 318 Md. 418, 428, 569 A.2d 202 (1990) (explaining that, with respect to "obvious injuries" in medical malpractice cases, no expert testimony is required where the common knowledge of the jurors is sufficient to support an inference and finding of negligence). We therefore conclude that the trial court did not err in finding that, under Maryland Rule 5–702, expert testimony was not necessary to assist the trier of fact to understand the evidence or determine a fact in issue.

### Cross Appeal

Ms. Deschamps argues that the trial court erred in reducing the jury verdict pursuant to the Maryland Tort Claims Act ("MTCA"), Md.Code (1984, 2004 Repl.Vol., 2008 Supp.), § 12–101 *et seq.* of the State Government Article ("SG"). In essence, Ms. Deschamps argues that WMATA does not enjoy the protections of Maryland state agencies under the MTCA. We disagree.

The issue Ms. Deschamps presents is one of statutory construction. We therefore review the trial court's judgment

*de novo. Public Service Comm'n of Maryland v. Wilson,* 389
Md. 27, 45–46, 882 A.2d 849 (2005). We have explained that
the cardinal rule of statutory construction is to ascertain
and effectuate the intent of the Legislature. We begin our
analysis by first looking to the normal, plain meaning of the
language of the statute so that no word . . . is rendered
superfluous or nugatory. Further, whenever possible, an
interpretation should be given to the statutory provisions
that does not lead to unreasonable or illogical consequences.
If the language of the statute is clear and unambiguous, we
need not look beyond the statute's provisions and our
analysis ends. If, however, the language is subject to more
than one interpretation, it is ambiguous, and we resolve that
ambiguity by looking to the statute's legislative history, case
law, and statutory purpose.

*Green v. N.B.S., Inc.,* 180 Md.App. 639, 655–56, 952 A.2d 364
(2008) (internal citations and quotation marks omitted).

 The MTCA was enacted for the purpose of creat-
ing a remedy for individuals injured by tortious conduct
attributable to the State. *Rios v. Montgomery County,* 386
Md. 104, 131 n. 13, 872 A.2d 1 (2005). That remedy exists only
because the State, by action of the legislature, has waived its
sovereign immunity under certain circumstances. *Dep't of
Natural Res. v. Welsh,* 308 Md. 54, 58–59, 521 A.2d 313 (1986).
That waiver, however, is not unlimited. Indeed, we have
noted that the "courts must construe legislative dilution of
governmental immunity narrowly in order to avoid weakening
the doctrine of sovereign immunity by judicial fiat." *Magnetti
v. Univ. of Maryland,* 171 Md.App. 279, 296, 909 A.2d 1101
(2006) (citation and internal quotation omitted), *aff'd* 402 Md.
548, 937 A.2d 219 (2007).

 WMATA was created by an interstate compact among
Maryland, Virginia, and the District of Columbia, and is
codified in Maryland in Md.Code (1977, 2008 Repl.Vol.), § 10–
201 *et seq.* of the Transportation Article ("TR"). TR § 10–
204(4) provides that WMATA is "an instrumentality and agen-
cy" of the State of Maryland. As such, TR § 10–204(80)

provides, in pertinent part, that "[WMATA] shall be liable for its contracts and for its torts and those of its directors, officers, employees and agents committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function." In other words, WMATA enjoys immunity from suit for any governmental functions it performs, and although it does not enjoy absolute immunity for proprietary functions, it nevertheless "has the even broader immunity a Maryland agency enjoys when suit is brought in Maryland courts." *Maxwell v. WMATA,* 98 Md.App. 502, 516, 633 A.2d 924 (1993).

One facet of the immunity enjoyed by Maryland agencies is a cap on damages in actions involving the State. SG § 12–104 provides:

(a) *In general.*—(1) Subject to the exclusions and limitations in this subtitle and notwithstanding any other provision of law, the immunity of the State and of its units is waived as to a tort action, in a court of the State, to the extent provided under paragraph (2) of this subsection.

(2) The liability of the State and its units may not exceed $200,000 to a single claimant for injuries arising from a single incident or occurrence.

Ms. Deschamps argues that WMATA is not a "unit" of the state as defined in the MTCA, and to hold otherwise is to read the MTCA too broadly. We disagree. Although the term "unit" is undefined in SG § 12–101 *et seq.,* and there is a dearth of authority directly on point, we note that the Court of Appeals has used language suggesting that units are indeed agencies. *See Evans v. State,* 396 Md. 256, 330, 914 A.2d 25 (2006) (stating "[w]e are dealing here with three agencies—the Department of Public Safety and Correctional Services (DPSCS), ... the [Department of Corrections], which is a unit within the DPSCS ..., and the Inmate Grievance Office (IGO), a unit that is also within DPSCS"); *Horridge v. St. Mary's County Dep't of Social Servs.,* 382 Md. 170, 174, 854

A.2d 1232 (2004) (describing a local department of social services as "a unit of the State Department of Human Resources and therefore a State agency"); *State v. Maryland Bd. of Contract Appeals*, 364 Md. 446, 456, 773 A.2d 504 (2001) (explaining that "[a]dministrativè agencies like the Board of Contract Appeals ... are not inferior tribunals in relation to the circuit courts; rather they are independent units of the executive branch of state government"). With that language in mind, and construing SG § 12–104(a)(2) narrowly, *Magnetti*, 171 Md.App. at 296, 909 A.2d 1101, we conclude that the trial court did not err in reducing Ms. Deschamps' award.

JUDGMENTS AFFIRMED. APPELLANT TO PAY THE COSTS.